UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-80299-CIV-MATTHEWMAN

BG STRATEGIC ADVISORS, LLC,

Plaintiff,

v.

FREIGHTHUB, INC.,

Defendant.
_____/

FREIGHTHUB, INC.,

Counterclaim Plaintiff,

v.

BG STRATEGIC ADVISORS, LLC,
BGSA HOLDINGS, LLC and
BENJAMIN H. GORDON,

Counterclaim Defendants.
_____/

FILED BY KJZ D.C.

Jun 24, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## ORDER ON COUNTERCLAIM DEFENDANTS' RENEWED MOTION TO DISMISS [DE 30]

THIS CAUSE is before the Court upon Plaintiff and Counterclaim Defendant BG Strategic Advisors, LLC ("BGSA") and Counterclaim Defendants BGSA Holdings, LLC ("BGSA Holdings") and Benjamin H. Gordon's ("Gordon") (collectively, "Counterclaim Defendants") Renewed Motion to Dismiss [DE 30]. The Motion is fully briefed and ripe for review. The Court has carefully considered the Motion and is otherwise fully advised in the premises.

I. Background

On February 9, 2021, Defendant FreightHub, Inc. ("FreightHub") filed a Notice of Removal of BGSA's two-count Complaint for breach of agreement (count I) and anticipatory breach of agreement (count II) filed in the 15th Judicial Circuit in and for Palm Beach County, Florida. [Compl., DE 1-2]. According to the allegations of the Complaint, BGSA is a Florida merger and acquisition advisory firm that specializes in providing merger and advisory services for companies in the supply chain sector. FreightHub is a cross-border shipping company. [Compl. ¶ 1]. BGSA and FreightHub entered into an agreement for BGSA to act as FreightHub's exclusive advisor in connection with "one or more business transactions." [Compl. ¶ 7; Engagement letter, Ex. A. to Compl.]. The parties' agreement provided that BGSA would receive three distinct compensation components, which included a retainer, a success fee, and an expense reimbursement. The agreement also provided for BGSA to serve as FreightHub's ongoing advisor. [Compl. ¶ 8]. The Complaint alleges that FreightHub failed to pay these fees as set forth in the engagement letter. [Compl. ¶¶ 3, 35]

On April 5, 2021, FreightHub filed its Answer, Affirmative Defenses and First Amended Counterclaims against BGSA, BGSA Holdings and Gordon.[1] The Counterclaim Complaint alleges a violation of the Investment Advisers Act of 1940 ("IAA"), 15 U.S.C. § 80b-1 *et seq.*, against BGSA (counterclaim one); breach of fiduciary duty against BGSA (counterclaim two); rescission or reformation of agreement against BGSA (counterclaim three); unjust enrichment against BGSA Holdings (counterclaim four); aiding and abetting against Gordon (counterclaim five) and declaratory judgment against BGSA, BGSA Holdings and Gordon (counterclaim six). [DE 23].

---

[1] Mr. Gordon is the principal and founding member of BGSA. [Counterclaim Complaint ¶ 17]. The Counterclaim Complaint alleges that BGSA is controlled by BGSA Holdings and Mr. Gordon. [Counterclaim Complaint ¶ 32].

According to the Counterclaim Complaint, BGSA is an investment advisor that offers expertise in the merger and acquisition field, offers investment analysis on market trends and company performance in the supply chain sector, and advises companies on the sale of their securities. [CC ¶¶ 53-55]. [2] BGSA publishes investment and market reports and hosts an annual industry conference. [CC ¶¶ 56-57, 60]. Gordon also publishes additional investment and market predictions and reports from his personal websites, referencing BGSA and the supply chain index data. [CC ¶ 59]. BGSA, acting together with BGSA Holdings, Gordon and other entities, organize, oversee and curate the annual conference and its attendees. [CC ¶ 61]. One of the core purposes of the annual conference is to facilitate capital raising and investment by and among its attendees, who include BGSA clients. [CC ¶ 62]. BGSA identifies potential investors and advisors for its clients, recommending or rejecting them based on BGSA's judgment and opinion. [CC ¶ 66]. BGSA provides its clients with market predictions in the supply chain sector. [CC ¶ 67].

At the time FreightHub engaged BGSA's services, FreightHub was seeking to sell its securities to investors. [CC ¶ 74]. BGSA claimed to have valuable connections and expertise, as well as capital-raising prowess and investment advice. [CC ¶¶ 75-76]. BGSA provided FreightHub with an engagement letter, dated December 11, 2017. [CC ¶ 77; Engagement letter]. The engagement letter states, "the terms under which [BGSA] will act as investor and exclusive advisor to FreightHub, Inc." [CC ¶¶ 78, 86; Engagement letter]. The engagement letter also states:

> During the term of BGSA's engagement, BGSA will provide the Company with advice and assistance in connection with the Transaction which BGSA customarily provides for engagements of this type to assist the Company in its efforts to identify and execute Transactions. In particular, BGSA shall work with the Company's management to: (i) study the business and operations of the Company and provide feedback on the strategic and operational initiatives that will support the growth of the Company; (ii) identify prospective investors and/or targets for the Company who shall be subject to the prior written approval of the Company, such approval to be in the sole and absolute discretion of the Company (an "Approved Target");

---

[2] Hereinafter, the Court will use "CC" when citing to the Counterclaim Complaint.

(iii) coordinate the information flow, on-site visits and due diligence activities with Approved Targets; and (iv) any other services that are mutually agreed upon between the Company and BGSA or that are otherwise reasonable, customary and appropriate in undertakings of this nature.

[Engagement letter].

The engagement letter provides that BGSA would work initially on a no-retainer basis, and Gordon (and/or his designees) would receive a retainer fee equal to 8% of the fully diluted equity of FreightHub's stock. [CC ¶ 80; Engagement letter]. The initial retainer fee would become payable after FreightHub closed its first qualifying "transaction," as defined in the engagement letter. [CC ¶ 81]. The engagement letter further provides for "success fees" to BGSA for "consummation of any [t]ransactions." [CC ¶ 82]. The engagement letter does not provide for commissions to BGSA nor the establishment of any banking, brokerage or other financial accounts with BGSA. [CC ¶ 83]. Under the engagement letter, BGSA agreed to "maintain any information received by it from the Company in the strictest confidence and . . . maintain such information with the same level of confidentiality as it maintains its own confidential information." [CC ¶ 84]. The engagement letter states BGSA is a "independent contractor" and is not assuming "the responsibilities of a fiduciary." [Engagement letter]. The engagement letter also states that "BGSA or its affiliates or designees intends to invest in the Company." [CC ¶ 87; Engagement letter].

With respect to termination, the engagement letter states:

The term of this Engagement will begin on the date of this letter and continue for twelve (12) months thereafter. In the event the Company consummates a Transaction during the term of this Engagement, then BGSA will be appointed as its ongoing advisor for the Company, on the same terms as this letter including paragraphs A and B unless otherwise mutually agreed, for as long as BGSA, Cambridge Capital, or Gordon remains involved with the company. The Company shall have the right to terminate this Agreement, but only for cause. "Cause" in this agreement means (i) an intentional act of fraud by BGSA; (ii) an intentional and continuing breach of BGSA's material obligations under this agreement; (iii) BGSA failing to be a registered broker-dealer, or (iv) intentional and continued

willful conduct by BGSA that is demonstrably and materially harmful to the Company. For purposes of this paragraph, an act, or a failure to act, shall not be deemed willful or intentional, as those terms are defined herein, unless it is done, or omitted to be done, in bad faith and without a reasonable belief that BGSA's actions were in the best interest of the company. Failure to meet objectives, by itself, does not constitute "Cause." In the event the Company believes BGSA has committed actions that would justify termination for Cause, then it shall give BGSA a written warning, and BGSA shall have the opportunity for a reasonable cure period (not to exceed 30 days) (the "Cure Period") in which it seeks to discontinue any actions that would justify termination for Cause. If BGSA succeeds in taking corrective action during this Cure Period, then the Company shall have no right to terminate BGSA for Cause. However, if BGSA fails to take corrective action during this Cure Period, then, and only then, the Company shall have the right to execute a Termination for Cause.

[Engagement letter].

FreightHub completed a 2018 capital-raising transaction following BGSA's engagement. [CC ¶ 103]. BGSA advised FreightHub on the transaction. [CC ¶ 104]. BGSA also advised FreightHub on the offering and sale of its securities to investors. [CC ¶ 105]. That transaction did not involve a merger, acquisition or change of control. [CC ¶ 106]. BGSA identified prospective investors to FreightHub and served a gatekeeper function on the offering and sale of securities. [CC ¶ 107]. BGSA invited FreightHub to its annual conference in January of 2018. [CC ¶ 108]. BGSA advised FreightHub on the suitability of investors and potential investors. [CC ¶ 109].

BGSA furnished potential investors with information, including market projections, revenue and growth predictions, forecasts, and models. [CC ¶ 112]. BGSA advised FreightHub on due diligence and disclosures. [CC ¶ 113]. BGSA had touted its deep industry connections and expertise to FreightHub, suggesting it could help FreightHub raise millions of dollars in capital investment. [CC ¶ 115]. In actuality, BGSA identified investors from whom FreightHub raised only $163,600.00. [CC ¶ 116].

FreightHub fully paid the success and the transaction fee for the transaction. [CC ¶¶ 124-25]. With respect to the payment of the retainer fee to "BGSA's principal, Benjamin Gordon and/or

his designees," FreightHub delivered a certificate for 80,000 shares of FreightHub common stock to BGSA Holdings in January of 2020. [CC ¶ 126].

Following a 2018 transaction, BGSA ceased to advise FreightHub and did no advisory work for FreightHub after approximately November of 2018. [CC ¶¶ 127-28.) BGSA and Gordon did not earn any further fees. [CC ¶ 129]. On March 22, 2019, FreightHub wrote Gordon and BGSA, stating in part:

> Following your initial involvement which resulted in investors investing $163,600 in the Company, neither you [Gordon] nor BGSA or Cambridge Capital have remained involved with the Company and no additional amounts were invested in the Company as a result of your involvement. Other than the initial few introductions to executives and your role in bringing a small investment, you have played no advisory role with the Company, and you have had no involvement with the Company since November 2018. The Company appreciates your early contributions. However, as of November 2018, you have had no involvement with the Company and the Company therefore no longer considers you as an advisor to the Company.

[CC ¶ 130].

Despite receiving this notice, BGSA continued to seek advisory work and fees from FreightHub throughout 2019. [CC ¶ 131]. In June of 2019, Gordon was suspended and fined by the Securities and Exchange Commission ("SEC") for securities violations. [CC ¶¶ 133-36]. BGSA concealed and misrepresented the SEC's administrative suspension order of Gordon. [CC ¶¶ 137-50]. In fact, Gordon continued to seek advisory fees and work from FreightHub during his suspension and made numerous incomplete and deceptive statements to FreightHub in which he claimed that he was allowed to work as a consultant despite the suspension. [CC ¶ 25]. FreightHub reiterated to BGSA on October 25, 2019 that "[a] continued advisory role per your engagement letter is subject to the entities or you 'remain[ing] involved with the company.' It has been a year or more since that involvement." [CC ¶ 132]. In October of 2020, BGSA demanded additional fees from FreightHub. [CC ¶¶ 151-53].

Counterclaim Defendants move to dismiss the counterclaims on the following grounds: (1) the counterclaim pursuant to the IAA must be dismissed because FreightHub has failed to plead that BGSA was acting as an investment advisor and not a broker-dealer; (2) the basis for counterclaims two and three rely on the viability of the IAA claim and therefore fail; (3) the unjust enrichment claim is conclusory and subject to the voluntary payment doctrine; (4) the aiding and abetting claims do not have underlying violations and there is no private right of action for aiding and abetting under the IAA and (5) the declaratory judgment count relies upon the underlying counts to proceed.

In response, FreightHub contends that it pled properly that BGSA is an investment advisor. With respect to the breach of fiduciary duty counterclaim, FreightHub states that the counterclaim pled that BGSA undertook the responsibility of an investment advisor and therefore owed FreightHub a fiduciary duty. FreightHub also contends it properly pled its claim for rescission or reformation as well as the claim for unjust enrichment. With respect to the aiding and abetting claims, FreightHub asserts that it properly incorporated the underlying factual allegations into this count. Finally, FreightHub states that because the rights under the engagement letter are uncertain, it is entitled to a declaratory judgment.

In reply, Counterclaim Defendants challenge the allegations FreightHub relies on to assert that BGSA is an investment advisor. With respect to the breach of fiduciary claim, Counterclaim Defendants reassert that unless the IAA applies, there is no viable breach of fiduciary duty claim. With respect to the claim for rescission or reformation, Counterclaim Defendants state that there is no allegation of a mistake as required under state law. Next, Counterclaim Defendants contend that the unjust enrichment and the aiding and abetting claims are not viable without the IAA claim.

7

II. Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950. When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted.

III. Discussion

A. Count one

Counterclaim Defendants move to dismiss the claim brought pursuant to the IAA because BGSA is not an investment advisor and did not purport to act as an investment advisor to FreightHub.

The IAA, which governs the conduct of "investment advisors," defines an "investment adviser" as:

> [A]ny person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include . . . (C) any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor . . .

15 U.S.C. § 80b-2(a)(11).

In *U.S. v. Elliott*, the Eleventh Circuit adopted the Securities and Exchange Commission's ("SEC") standard for determining who is an investment advisor for the purpose of the IAA. *U.S. v. Elliott,* 62 F.3d 1304 (11th Cir. 1995). Whether a person is an investment advisor under *Elliot* depends on "all relevant facts and circumstances" and "whether such person: (1) [p]rovides advice, or issues reports or analyses, regarding securities; (2) is in the business of providing such services; and (3) provides such services for compensation." *Id.* at 1309-10 (quoting *Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services*, Investment Advisers Act Release No. IA-1092, 52 Fed. Reg. 38400, 38401-02 (Oct. 8, 1987)).

Counterclaim one alleges that BGSA is an investment advisor that advises companies on the sale of their securities. [CC ¶¶ 53-55]. According to the allegations of counterclaim one, BGSA offers the public its investment analysis on market trends and company performance in the supply chain sector. [CC ¶ 54]. BGSA publishes a monthly investment and market report, hosts an annual industry conference, and offers services such as "portfolio strategy" and "financial assessment." [CC ¶¶ 56, 60, 65]. Based on these allegations, the Court concludes that counterclaim one adequately pleads that BGSA acted as an "investment advisor" under the IAA.

Counterclaim Defendants, however, rely on the engagement letter[3] to assert that BGSA is a registered broker-dealer, not an investment advisor. Additionally, they claim the engagement letter confines the services provided by BGSA to the structuring of FreightHub's securities only, and assert such services are outside the purview of an "investment advisor."

The Court rejects Counterclaim Defendants' argument that the engagement letter demonstrates, as a matter of law, that BGSA was a broker-dealer, and not an investment advisor to FreightHub. The engagement letter opens by stating that BGSA "will act as investor and exclusive advisor" to FreightHub. Nowhere in the engagement letter does it state that BGSA is a broker-dealer.Nor does the engagement letter reference any brokerage accounts or services. Instead, the engagement letter only states that FreightHub has the right to terminate the agreement for cause if "BGSA fail[s] to be a registered broker-dealer." At this early stage of the proceedings, and without the benefit of a full factual record, the Court is unable to conclude that the engagement letter establishes that the parties agreed for BGSA to act as a broker-dealer for FreightHub.

Equally unavailing is Counterclaim Defendants' argument that, according to the engagement letter, FreightHub hired it to advise FreightHub only on the sale of its own securities, an activity that takes it outside of the IAA. In making this argument, Counterclaim Defendants rely on a 2013 SEC publication[4] that states that "the SEC staff does not believe that the [IAA] applies to persons whose activities are limited to advising issuers concerning the structuring of their securities offerings (although such advice may technically be about securities)." https://www.sec.gov/about/offices/oia/oia_investman/rplaze-042012.pdf.

---

[3] The Court may consider the engagement letter when determining whether BGSA acted as an investment advisor. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) (A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls.).

[4] The Court makes no determination as to the weight this publication should receive by the Court.

10

The Court cannot address this argument at this time. The engagement letter does not clearly identify the tasks BGSA agreed to perform for FreightHub. Instead, the engagement letter states "BGSA will provide the Company with advice and assistance in connection with the [t]ransaction which BGSA customarily provides for engagement of this type to assist the Company in its efforts to identify and execute [t]ransactions." [Engagement letter]. Although the engagement letter lists several tasks BGSA would undertake for FreightHub, it also states that BGSA will perform "any other services that are mutually agreed upon between [FreightHub] and BGSA or that are otherwise reasonable, customary and appropriate in undertakings of this nature" [Engagement letter]. Given the general language of the engagement letter, the Court is not able to determine the tasks BGSA agreed to perform for FreightHub. Without knowing what tasks were agreed upon, the Court cannot determine, as a matter of law, whether BGSA agreed to serve as an investment advisor, as defined under the IAA.

For these reasons, the Court denies Counterclaim Defendants' motion to dismiss count one of the Counterclaim.[5]

B. Counterclaims two and three

With respect to counterclaims two and three, Counterclaim Defendants' arguments for dismissal are premised on the Court dismissing the IAA claim. Because the Court has determined that count one may proceed, Counterclaim Defendants' arguments with respect to counterclaims two and three are moot, and these counterclaims may proceed.

---

[5] Counterclaim Defendants move to strike any claims for damages sought in count one. [DE 30 at 13]. FreightHub does not dispute that it is not entitled to damages under this claim. [DE 32 at 13. Indeed, counterclaim one seeks restitution, not damages. [CC ¶ 175]. Thus, the motion to strike is denied.

C. Counterclaim four

Counterclaim four brings a claim for unjust enrichment. A claim for unjust enrichment under Florida law requires showing that: (1) plaintiff has conferred a benefit on defendant; (2) defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for defendant to retain it without paying the value thereof. *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (citations omitted); *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. Dist. Ct. App. 2018).

Counterclaim four alleges that FreightHub conferred benefits on BGSA, in the form of cash compensation, and on BGSA Holdings in the form of stock compensation, and BGSA and BGSA Holdings voluntarily accepted and retained those benefits. [CC ¶¶ 207-08]. This counterclaim also alleges that the "circumstances render their retention of benefits conferred upon them inequitable and unjust." [CC ¶ 209]. Although paragraph 209 appears at first blush to be conclusory, the "circumstances" are incorporated by reference, *see* CC ¶ 206, to the allegations in paragraph 1 through 153, allegations which adequately allege fraudulent activity by these Counterclaim Defendants. Hence, the Court concludes that this claim is properly pled.

Moreover, the Court rejects Counterclaim Defendants' reliance on Florida's voluntary payment doctrine as a basis to dismiss the claim. [DE 30 at 18]. The voluntary payment doctrine is an affirmative defense and may not be raised on a motion to dismiss. *Sale v. Ferrari Fin. Servs., Inc.,* No. 19-23563-CIV, 2020 WL 5750502, at *9 (S.D. Fla. Sept. 25, 2020); *see Cox v. Porsche Fin. Servs.*, 342 F. Supp. 3d 1271, 1290 (S.D. Fla. 2018) (same); *Deere Constr., LLC v. Cemex Constr. Materials Florida., LLC*, 198 F. Supp. 3d 1332, 1342 (S.D. Fla. 2016) (same). As such, the Court denies the motion to dismiss the unjust enrichment counterclaim.

D. Counterclaim five

Counterclaim Defendants move to dismiss the aiding and abetting claim against Gordon on the basis that the claim requires an underlying wrong, and if the IAA claim and the breach of fiduciary duty claim fail, this claim must fail as well. As stated *supra*, since the breach of fiduciary claim is proceeding, an aiding and abetting of the breach of fiduciary duty claim may proceed as well. *Court-Appointed Receiver of Lancer Mgmt. Grp. LLC v. Lauer*, No. 05-60584CIV, 2008 WL 906274, at *5 (S.D. Fla. Mar. 31, 2008) (permitting an aiding and abetting breach of fiduciary duty claim).

In examining the viability of the aiding and abetting of the breach of the IAA claim, the Court begins by examining *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979), wherein the Supreme Court held that "there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisors contract, but that the Act confers no other private causes of action, legal or equitable." *Id.* at 24. The few courts that have addressed the impact of this opinion on the viability of aiding and abetting liability under the IAA have concluded that there is no private remedy for aiding and abetting under the IAA. For example, in *Wellington International Commerce Corp. v. Retelny*, 727 F. Supp. 843 (S.D.N.Y. 1989), the court noted that "it is clear from the Supreme Court's opinion in *Transamerica* that the Investment Advisers Act only provides a private cause of action for rescission of the contract and recovery of consideration paid. The traditional contract remedy of rescission does not include a tort claim against other entities who are not parties to the contract." *Id.* at 888 (ellipses omitted); *see also Padilla v. Winger*, No. 2:11CV897DAK, 2012 WL 1379228, at *5 (D. Utah Apr. 20, 2012) (the plaintiffs cannot state

13

a claim for aiding and abetting a violation of the IAA); *Mekhjian v. Wollin*, 782 F. Supp. 881, 888 (S.D.N.Y. 1992) (no private remedy for aiding and abetting under the IAA).[6]

For these reasons, the Court grants the motion to dismiss with respect to aiding and abetting the IAA claim but denies the motion to dismiss with respect to the aiding and abetting the breach of fiduciary duty claim.

E. Counterclaim six

Counterclaim Defendants move to dismiss the declaratory judgment claim on the basis that, if counterclaim counts one through four fail, the declaratory judgment count is "nothing more than an affirmative defense." [DE 30 at 19]. The Court is permitting those counts to proceed and therefore this argument is rejected.

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Counterclaim Defendants' Renewed Motion to Dismiss [DE 30] is **GRANTED IN PART AND DENIED IN PART**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 24th day of June, 2021.

_____
WILLIAM MATTHEWMAN
United States Magistrate Judge

---

[6] The only case the Court found allowing aiding and abetting liability under the IAA was decided prior to *Transamerica*. *See Sullivan v. Chase Inv. Services of Boston, Inc.*, 434 F. Supp. 171, 185 (N.D. Cal. 1977) (permitting aiding and abetting liability under the IAA), and the Court does not find it persuasive and declines to follow it.