**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

BG STRATEGIC ADVISORS, LLC,
      Plaintiff,

v.

FREIGHTHUB, INC.,
      Defendant.

_____/
                               Case No. 9-21-cv-80299-WM

FREIGHTHUB, INC.,
      Counterclaim Plaintiff,

v.

BG STRATEGIC ADVISORS, LLC;
BGSA HOLDINGS, LLC; and BENJAMIN
GORDON,
      Counterclaim Defendants.

_____/

**BGSA PARTIES' MOTION FOR**
**PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

      Plaintiff and Counterclaim Defendant BG Strategic Advisors, LLC ("BGSA") and Counterclaim Defendants BGSA Holdings, LLC ("BGSA Holdings") and Benjamin Gordon ("Gordon") (collectively, the "BGSA Parties), by and through the undersigned counsel, and, pursuant to Federal Rule of Civil Procedure 56, hereby file their Motion for Partial Summary Judgment as to liability against Defendant/Counterclaim Plaintiff FreightHub, Inc. ("FreightHub") for Counts I and III of BGSA's First Amended Complaint (D.E. 51) and all counts of FreightHub's First Amended Counterclaim (D.E. 53).  In support thereof, the BGSA Parties state as follows:

**INTRODUCTION**

I.      **The Parties.**

      BGSA provides merger, acquisition, and private placement services for companies in the supply chain sector.  BGSA is a single-member LLC held by BGSA Holdings LLC.  Gordon was the managing partner of BGSA during the period of late 2017 to 2018.  At all times relevant to this litigation, Shai Greenwald ("Greenwald") was the Director of Business Development at BGSA.

FreightHub is a transportation logistics technology platform company.[1]   At the times relevant to the relationship between FreightHub and FreightApp, Edmundo Gonzalez ("Gonzalez") was FreightHub's Chairman and Ohad Axelrod ("Axelrod") was FreightHub's Chief Executive Officer ("CEO").

## II.      Brief Statement of the Case.[2]

FreightHub was a startup technological logistics company.  Like most startups, FreightHub was in dire need of capital to continue funding its operations, as FreightHub still has not shown a profit as of the end of 2022.  In December 2017, FreightHub became affiliated with BGSA to provide legitimacy to FreightHub and to help FreightHub acquire capital to continue its operations. The Parties formalized this arrangement through an Engagement Letter, whereby BGSA waived its monetary retainer and up-front fees in favor of appointment as an ongoing advisor—if BGSA was successful in securing a Transaction for FreighHub.  The Parties agreed that BGSA's success under the Engagement Letter would be directly tied to FreightHub's success.  There is no dispute that BGSA performed under the Engagement Letter.  Now, however, FreightHub does not want to pay the fees due thereunder.   In discovery, the BGSA Parties uncovered the real reason that FreightHub refused to perform under the Engagement Letter:  FreightHub found a new advisor that wanted a stake in the future of FreightHub, which would not have been possible under BGSA's Engagement Letter.  As a result, FreightHub tried to push the BGSA Parties out of the picture. Throughout the pendency of this lawsuit, FreightHub has attempted to invalidate the Engagement Letter that it entered into voluntarily and with the advice of counsel.  Those attempts must fail.

BGSA initiated this case in state court in January 2021.  Since then, the case was removed to this Court, underwent multiple amendments of pleadings, and was the subject of a motion to dismiss the Counterclaim, which this Court granted in part and denied in part.  (D.E. 48.)  The case is now special set for trial to begin in October 2023.  As of the date of this Motion, thousands of documents have been produced and a number of depositions have been taken.  The BGSA Parties'

---

[1] Since the filing of this lawsuit, FreightHub changed its name to Freight App, Inc.  However, since there was no substitution necessary and for the sake of clarity, Defendant will be referred to as FreightHub for the purposes of this Motion.

[2] In accordance with the Court's local rules, a separate Statement of Material Facts upon which this Motion is based was filed at Docket Entry 128, with a redacted copy filed at Docket Entry 129.  A brief summary is provided here for ease of reference.  The Appendix is filed at Docket Entry 126, with a redacted copy filed at Docket Entry 127.

claims are unequivocally supported by documents produced during discovery and the relevant deposition testimony. For the reasons stated herein, there is no genuine issue of material fact and no instance in which a reasonable fact finder could find for FreightHub as to Counts I and III of the First Amended Complaint, FreightHub's affirmative defenses thereto, or as to the claims remaining in FreightHub's Restated First Amended Counterclaim.[3] The BGSA Parties are, thus, entitled to summary judgment in their favor on Counts I and III of the First Amended Complaint and all counts of the First Amended Counterclaim.

### III.     Legal Standard on a Motion for Summary Judgment.

"Under Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Segev v. Lynn Univ., Inc*., No. 19-81252-CIV, 2021 WL 1996437, at *2 (S.D. Fla. May 19, 2021) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (citing Fed. R. Civ. P. 56(a)). A court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence. *See Pace v. Capobianco*, 283 F. 3d 1275, 1276, 1278 (11th Cir. 2002). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F. 3d 1321, 1326 (11th Cir. 2005) (citation omitted).

### MEMORANDUM OF LAW AS TO THE FIRST AMENDED COMPLAINT

BGSA's First Amended Complaint against FreightHub contains three causes of action: (1) breach of agreement; (2) anticipatory breach of agreement; and (3) declaratory judgment. (D.E. 51.) The BGSA Parties are only moving for summary judgment as to liability on Counts I and III of the Amended Complaint.

### I.     FreightHub's Corporate Representative's Lack of Knowledge Does Not Create a Genuine Issue of Material Fact.

A corporation has an affirmative duty to produce a witness who is able to provide binding answers on behalf of the corporation. *QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 688 (S.D. Fla. 2012); see also Fed. R. Civ. P. 30(b)(6). "When a corporation's designee legitimately lacks the ability to answer relevant questions on listed topics and the corporation

---

[3] *See* D.E. 116, whereby the Parties stipulated that Count V of the Restated First Amended Counterclaims (D.E. 53), aiding and abetting the purported breach of the Investment Advisers Act of 1940, remains dismissed under the Court's previous order (D.E. 48), despite its restatement.

cannot better prepare that witness or obtain an adequate substitute, then the 'we-don't-know' response can be binding on the corporation and prohibit it from offering evidence at trial on those points." *Id.* at 690 (citations omitted).  In other words, "the lack of knowledge answer is itself an answer which will bind the corporation at trial." *Id.*  Such answers can also be the basis for a motion for summary judgment.  *See, e.g., In re Seven Stars on Hudson Corp.*, 637 B.R. 180, 206 (Bankr. S.D. Fla. 2022), aff'd sub nom. *Seven Stars on the Hudson Corp. v. MDG Powerline Holdings, LLC*, No. 22-CIV-60299-RAR, 2022 WL 10046439 (S.D. Fla. Oct. 17, 2022) (granting defendants' motion for summary judgment after plaintiff's Rule 30(b)(6) representative "could not testify as to any specific amounts" to a question on damages and explaining that defendants "were entitled to rely on [the deponent's] Rule 30(b)(6) deposition testimony," which created no genuine dispute of material fact and entitled defendants to summary judgment).

On September 10, 2021, the BGSA Parties noticed the deposition of FreightHub's corporate representative for September 16, 2021, providing FreightHub with nineteen deposition topics.[4]  (D.E. 126-22.)  FreightHub designated its Chief Financial Officer, Paul Freudenthaler ("Freudenthaler"), as FreightHub's 30(b)(6) representative.  Despite the long list of topics that the BGSA Parties noticed, Freudenthaler repeatedly answered questions with forms of "I don't know":

> Q: So what you're testify to here today is your personal knowledge and FreightHub has not made anyone available to testify to who was in control of FreightHub at the time?
>
> A: I don't know if it has been requested.
>
> Q: That is for me and your lawyer to discuss later, but you are not prepared to testify to those topic today?
>
> A: I am not, no.
>
> --
>
> Q: So sitting here today you do not know what the company did or didn't know then, correct?
>
> A: I do not know what the company knew then correct.

(D.E. 126-2 13:1–9; 40:6–9.)  Accordingly, FreightHub must be precluded from offering any testimony at trial on any subject about which its corporate representative was unable or unwilling

---

[4] While the deposition was not formally noticed until September 10, 2021, the date was offered by FreightHub on August 6, 2021, and the draft deposition topics had been provided on March 18, 2021.  So, to the extent that it appears that FreightHub was rushed into preparing, FreightHub most certainly was *not*.

to testify at the 30(b)(6) deposition.  Put simply, Freudenthaler's deposition cannot be the basis of any dispute of material fact where he was unable to answer duly noticed deposition questions. This is crucial, particularly as to FreightHub's Counterclaims, because FreightHub simply cannot support its own allegations.[5]

## II.     A Valid, Binding, And Enforceable Agreement Exists.

The basic elements of an enforceable contract are offer, acceptance, and consideration. *SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197 (Fla. 2nd DCA 2012).  Florida courts have consistently held that an objective test is used to determine whether a contract is enforceable. *Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp*., 302 So. 2d 404, 407 (Fla. 1974). "The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties having meant the same thing but on their having said the same thing." *Id.* (citing *Gendzier v. Bielecki*, 97 So.2d 604, 608 (Fla. 1957)). "Even though all details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them." *Leopold v. Kimball Hill Homes Fla., Inc*., 842 So. 2d 133, 137 (Fla. 2d DCA 2003) (citing 17 C.J.S. Contracts § 31).  Additionally, "[i]t is well settled that where a determination of liability depends upon a written instrument and its legal effect, the question is essentially one of law and is ordinarily determinable by the entry of summary judgment."  *Ball v. Florida Podiatrists Trust*, 620 So. 2d 1018, 1022 (Fla 1st DCA 1993).

### a.   It is Undisputed that the Agreement is Enforceable

There is no genuine issue of material fact as to whether a valid Agreement (D.E. 120-1)[6] exists between BGSA and FreightHub.  First, an offer existed as of the time that Gordon provided FreightHub with the first version of the Agreement.  Second, acceptance was given at the time that

---

[5] "Although the engagement letter lists several tasks BGSA would undertake for FreightHub, it also states that BGSA will perform 'any other services that are mutually agreed upon between [FreightHub] and BGSA or that are otherwise reasonable, customary and appropriate in undertakings of this nature' [Engagement letter].  Given the general language of the engagement letter, the Court is not able to determine the tasks BGSA agreed to perform for FreightHub. Without knowing what tasks were agreed upon, the Court cannot determine, as a matter of law, whether BGSA agreed to serve as an investment advisor, as defined under the IAA."  (D.E. 48 at 11.)

[6] The Agreement was also authenticated in many other ways, for instance in the Axelrod Deposition, D.E. 126-4, at 10:9 to 11:15, and in the Declaration of Shai Greenwald, D.E. 117-1.

Axelrod, FreightHub's CEO, signed the Agreement on December 11, 2017. (D.E. 120-1 p. 4.) It is undisputed that Axelrod had authority to bind FreightHub to the Agreement on December 11, 2017. (D.E. 126-4 11:6–15.) Lastly, valid consideration is present because there is a bargained-for exchange between the Parties. BGSA promised to provide services, and FreightHub promised to pay BGSA fees in consideration for those services. (D.E. 120-1 at 1–2.) In this lawsuit, it is expected that FreightHub will claim that the Agreement is invalid because the payment to BGSA is unreasonably high.[7]  However, this would entirely ignore the fact that FreightHub itself requested that no up-front fee be paid to BGSA in favor of a higher back-end fee because FreightHub simply could not afford to pay BGSA a retainer fee in December 2017. (D.E. 126-4 33:22–34:23.)

FreightHub was indisputably represented by counsel throughout the negotiation of the Agreement and received the legal go-ahead before executing the Agreement.[8] (D.E. 126-2 22:7–10, 14–15; 25:6–20); (D.E. 126-4 11:25; 12:1–5); (D.E. 126-6 18:21–19:3); (D.E. 126-25); (D.E. 126-26).  As all elements of a valid contract exist, it is clear that the Parties intended for the Agreement to be binding.  Therefore, the Agreement is valid.

> *b.  It is Undisputed that BGSA Performed Under the Agreement*

The terms of the Agreement provided that BGSA "will act as investor and exclusive advisor[9] for FreightHub." (D.E. 120-1 at 1.)  The Agreement defines BGSA's performance as follows:

> BGSA shall proceed with its efforts to find a Transaction or multiple Transactions acceptable to the Company and its shareholders. Said opportunity may involve a capital raise, strategic investment, acquisition, sale, merger, combination, reorganization, recapitalization or other business transaction with the Company, in which the Company sells, transfers or exchanges any or all of its assets, liabilities, or stock in any transaction whether for cash, securities or other consideration, as a single transaction or series of transactions, except as done in the ordinary course of business (collectively, a "Transaction")
> --

---

[7] The Parties only now know the fees due under the Agreement because the fees were dependent on the value of any Transactions closed by FreightHub during the term thereof. In other words, if FreightHub did better, BGSA did better.

[8] This argument is most relevant to FreightHub's claim that the Agreement is illegal.

[9] While FreightHub has argued that there is no difference between the use of the word "advisor" and "adviser," that is FreightHub's attempts to abandon the precision that BGSA used to make clear that it was not an *investment adviser*, but instead simply an advisor.

> During the term of BGSA's engagement, BGSA will provide the Company with advice and assistance in connection with the Transaction which BGSA customarily provides for engagement of this type to assist the Company in its efforts to identify and execute Transactions.

(D.E. 120-1 at 1.) BGSA worked tirelessly to introduce potential investors to FreightHub. Although not all conversations led to a "Transaction," it is undisputed that BGSA made efforts to consummate a "Transaction" as required by the Agreement. Axelrod testified:

> Q: . . . So again, the deal was done in December of 2017; correct?
>
> A: Yes.
>
> Q: And we've seen emails that [BGSA was] actively involved in February of 2018.
>
> A: Yes.
>
> Q: And we've seen emails that they were actively involved in April of 2018.
>
> A: Yes.
>
> Q: And we've seen emails that they were actively involved in July of 2018.
>
> A: Yes.

(D.E. 126-4 51:4–15.) In fact, it is undisputed that at least one "Transaction" did in fact take place. (D.E. 126-2 17:10–14; 18:4–6; 59:14–18; 124:2–6, 11–15; 187:18–20); (D.E. 126-4 11:6-15; 27:16-28:4; 29:5-15); (D.E 126-17 at 11); (D.E 126-8); (D.E. 126-11 at 1, 7, 10); (D.E. 126-23); (D.E. 126-24). When asked whether a transaction occurred within the first twelve months of the Agreement, Freudenthaler answered under oath: "There was a capital raise. There was funds received, *yes*." (D.E. 126-2 59:14–18) (emphasis added). Accordingly, there can be no genuine dispute that BGSA met its performance obligations under the Agreement.

## III.    FreightHub Breached The Agreement.

Under Florida law, the elements of breach of contract are: (1) the existence of a contract, (2) a breach thereof, and (3) damages flowing from the breach. *Wistar v. Raymond James Fin. Servs., Inc.*, 365 F. Supp. 3d 1266, 1269 (S.D. Fla. 2018) (citing *Knowles v. C. I. T. Corp.*, 346 So.2d 1042, 1043 (Fla. 1st DCA 1977)). "A material breach occurs where the covenant not performed is of such importance that the contract would not have been made without it." *Seawatch at Marathon Condo. Ass'n, Inc. v. Guarantee Co. of N. Am.*, 286 So. 3d 823, 829 (Fla. 3d DCA 2019) (citation omitted). Under general contract principles, the plain meaning of a contract's language governs its interpretation. *Belize Telecom, Ltd. v. Belize*, 528 F.3d 1298, 1307 n.11 (11th Cir. 2008).

a. *FreightHub Breached the Agreement by Attempting to Terminate the Agreement without Cause*

The Agreement provided FreightHub with the opportunity to terminate, "but only for cause." (D.E. 120-1 § C) (emphasis added). The Agreement defines "cause" as:

(i) an intentional act of fraud by BGSA; (ii) an intentional and continued breach of BGSA's material obligations under this agreement; (iii) BGSA failing to be a registered broker-dealer; or (iv) intentional and continued willful conduct by BGSA that is demonstrably and materially harmful to the Company.
--
Failure to meet objectives, by itself, ***does not*** constitute "Cause."

(D.E. 120-1 § C) (emphasis added). Without cause, the Agreement—and the Parties' obligations thereunder—was to last until a change in control of FreightHub. (D.E. 126-6 131:18–132:7.) The Agreement continues by providing a mandatory termination procedure as follows:

In the event the Company believes BGSA has committed actions that would justify termination for Cause, then it ***shall*** give BGSA a written warning, and BGSA ***shall*** have the opportunity for a reasonable cure period (not to exceed 30 days) (the "Cure Period") in which it seems to discontinue any actions that would justify termination for cause. If BGSA succeeds in taking corrective action during the Cure Period, then the Company shall have no right to terminate BGSA for cause.

(D.E. 120-1 § C) (emphasis added).

Nonetheless, on September 27, 2018 (before the initial term of the Agreement expired but after a Transaction was completed), Axelrod emailed Gordon attempting to terminate the Agreement. (D.E. 126-15 at 2–3.) It is important to note that, despite the clear requirements of the Agreement, neither notice nor opportunity to cure was provided to BGSA. This was entirely improper.

In October 2018, after reviewing the terms of the Agreement, FreightHub (1) realized that its attempted termination was a breach of the Agreement, (2) sent BGSA an email referring to their relationship as "long term," and (3) allowed BGSA to continue working to find investors. (D.E. 126-10 at 1.) Importantly, Axelrod agreed to "continue [the Agreement] to the full term," indicating that FreightHub would be honoring the terms of the Agreement. (D.E. 126-10 at 1.) FreightHub will undoubtedly argue that the "full term" of the agreement meant one year—through December 11, 2023. This argument falls flat because, the very next day, Axelrod confirmed that the Agreement "*is a long term agreement and we want to continue our work together.*" (D.E. 126-10 at 1 (emphasis added).) Clearly, after its initial termination attempt, FreightHub did an about-face, confirmed the Agreement's long-term nature, and confirmed FreightHub's intention to

continue the Agreement beyond December 2018 (which would have been only two months later). If this was not enough, on November 8, 2018, once again after the attempted termination, FreightHub indicated its "sincere desire to . . . continue working with [BGSA]. (D.E. 126-17 at 12.) Thus, it is undisputed that no termination occurred.

Notwithstanding the foregoing, FreightHub still claims that the Agreement was properly terminated. It was not. In FreightHub's Rule 30(b)(6) deposition, Freudenthaler even admitted that no breach occurred prior to FreightHub's attempted termination. (D.E. 126-2 187:2–6.) Specifically:

> Q: The company doesn't contend that BG Strategic Advisors breached the agreement prior to being notified that it was no longer involved?
>
> A: I don't think that specific language was used in communications with them, correct.

(D.E. 126-2 187:2–6.)[10] In fact, Freudenthaler admitted that FreightHub takes the position that the potential investors that were brought to it by BGSA were not sufficient investors in FreightHub's opinion. (D.E. 126-2 187:13–17.) The Agreement expressly states that such action cannot constitute "cause" for termination. (D.E. 120-1 § C.)

Once FreightHub realized that FreightHub's actions could be considered a breach of the termination provisions of the Agreement, FreightHub quickly concocted a scheme to avoid the Agreement altogether. In fact, during his deposition, the then-Chairman of FreightHub indicated that the whole idea for this pretextual lock out came from FreightHub's counsel. (D.E. 126-6 54:4–55:16.) Specifically, FreightHub would claim—and has now claimed—that BGSA was no longer "involved" with FreightHub after November 2018. (D.E. 126-11 at 10.) FreightHub claimed that this allowed FreightHub to terminate the Agreement. (D.E. 126-11 at 10.) No trier of fact could find that BGSA ceased to be involved, however, because, in addition to the fact that there is direct evidence to the contrary, there was nothing in the Agreement that allowed FreightHub to lock BGSA out in the manner in which FreightHub did. In fact, BGSA—through Gordon, Greenwald, and others, was involved and making introductions for FreightHub up until—at the earliest—October 2019. Specifically, there is direct evidence in the form of emails from

---

[10] Importantly, FreightHub stating that it had no ability to terminate the Agreement for cause essentially admits that BGSA *never ceased to be a registered broker-dealer*. (D.E. 120-1 § C(iii)) (allowing FreightHub to terminate the Agreement for cause if "BGSA fail[ed] to be a registered broker-dealer").

BGSA to FreightHub showing such involvement by BGSA in January 2019, March 2019, May 2019, and October 2019, at least, so FreightHub clearly knew of this involvement.[11]  (D.E. 126-4 63:23; 118:3–9); (D.E. 126-2 186:15–20) (D.E. 126-11 at 3, 8, 9); (D.E. 126-16 at 1, 2); (D.E. 126-17 at 1, 3, 4).[12]

BGSA was indisputably involved with FreightHub and potential investors for FreightHub during the time that FreightHub claims that BGSA was no longer involved.  Gonzalez and Axelrod even acknowledged that BGSA could be having conversations with potential investors of which FreightHub would be unaware until they were informed by BGSA.  (D.E. 126-4 67:21–24) (D.E. 126-6 155:13–18).  And, importantly, FreightHub received new loans, investments, and capital during this time, which FreightHub acknowledges could be as a result of BGSA's name recognition—after all, FreightHub was promoting its relationship to BGSA to its existing investors, from which FreightHub secured the additional financing.  (D.E. 126-4 103:20–24; 105:5–21); (D.E. 126-5 116:20–21); (D.E. 126-6 98:3–11); (D.E. 126-14 at 1); (D.E. 126-33 at 2). Moreover, it is undisputed that FreightHub never expressly told BGSA to stop working under the Agreement.  (D.E. 126-4 146:9–13).

Crucially, during the time when BGSA was tirelessly working to secure investors for FreightHub, FreightHub itself was struggling to find investors.  (D.E. 126-12 at 1) (D.E. 126-4 33:16–21; 41:15–16, 20–21; 50:14–17).  In fact, Gordon informed FreightHub of the difficulties that he was having finding investors because of FreightHub's financial situation.  (D.E. 126-13 at 1.)  Nonetheless, BGSA continued to introduce FreightHub to potential investors.  (D.E. 126-12); (D.E. 126-13); (D.E. 126-18); (D.E. 126-29); (D.E. 126-31); (D.E. 126-34); (D.E. 126-37); (D.E. 126-38).  In fact, on June 16, 2018, FreightHub's then-Chairman emailed Gordon, stating,

---

[11] It may be the case that the current leadership and management of FreightHub truly did not know about this involvement, but that was through no fault of BGSA's.  Mr. Axelrod was terminated from the company at some point in 2019, and Mr. Gonzalez refused to use a @fr8hub.com email address, meaning that any such records were lost to FreightHub until produced by BGSA in this litigation.  Even though such records were requested of FreightHub and Mr. Gonzalez (as well as the company by whom Mr. Gonzalez was issued the email *that he did use*), FreightHub could not locate or produce these records.  This will be the subject of a coming Motion for Spoliation Sanctions.

[12] This list is not exhaustive of BGSA's efforts and involvement in procuring investors for FreightHub during this period.

"The current investors just put in $215k.  I think that's it.  The company has cash for another 45 days or so.  We need to find a strategic buyer and/or another investor for $500k."  (D.E. 126-39.)

Simply put, without having cause to terminate the Agreement, and, in an attempt to avoid paying BGSA the agreed-upon fees, FreightHub took matters into its own hands.  FreightHub tried the silent treatment.  Among other actions, FreightHub ignored BGSA's emails, failed to provide proper documentation, cancelled meetings, and denied qualified investors.  (D.E. 126-2 86:19–22; 94:16–20; 104:25–105:3; 105; 107:1–3); (D.E. 126-4 74:15–25); (D.E. 126-19 at 1); (D.E. 126-18 at 1, 2).  If this were not enough, FreightHub also kept moving the ball on BGSA in terms of what FreightHub was looking for in terms of a potential partner (*i.e.*, cash as capital or cash as debt). (D.E. 126-18.)

The BGSA Parties' counsel proposed a very similar hypothetical to Freudenthaler, who answered as follows on behalf of FreightHub:

> Q: The question is if you have an agreement with somebody that you cannot terminate it unilaterally but it does say that it will only continue if you continue to be involved, wouldn't that company be able to make it terminable by cutting the other person off?
>
> A: I think what you are suggesting could happen, yes.

(D.E. 126-2 174:1–7.)  And—even if Mr. Freudenthaler did not realize it during his testimony— that is exactly what FreightHub did.  As a direct result of FreightHub's actions, BGSA was locked out of FreightHub.  But, without FreightHub's actions, BGSA would still be FreightHub's ongoing advisor pursuant to the Agreement.  (D.E. 120-1 § C.)  FreightHub cannot now claim termination based on failure to perform if FreightHub was the one preventing performance.  BGSA sat ready to perform as FreightHub's ongoing advisor if FreightHub had not cut it out.  (D.E. 117 ¶ 10.) FreightHub cannot be allowed create a technical breach just to exploit it for its own benefit.

FreightHub will likely argue that—despite the initial one-year term—the Agreement had no term and was thus a contract with an indefinite term.  FreightHub will likely argue that—despite the express language of the contract that states BGSA will be "ongoing advisor" that the Parties did not intend for the Agreement to be perpetual.  This argument fails before it begins.  First, FreightHub breached during the initial term by attempting to cancel before appointing BGSA as ongoing advisor and failing to pay success fees on at least one transaction in 2018.  (D.E. 126-15.) Second, the Parties clearly contemplated a one-year initial term and then ongoing advisory services when the Parties used the term "ongoing advisor."

It is undisputed that BGSA (1) did not breach the Agreement, (2) there was no cause to terminate the Agreement, (3) even if there was cause, FreightHub provided BGSA with no notice or opportunity to cure, and (4) BGSA was involved with FreightHub long after November 2018. The Agreement was never terminated and is still valid, binding, and enforceable to this day.

      *b.* *FreightHub Breached the Agreement by Failing to Appoint BGSA as Ongoing Advisor*

Although the initial term of the Agreement was twelve months, the Agreement expressly provided for the opportunity for BGSA and FreightHub to continue their relationship if:

> In the event the Company consummates a Transaction during the term of this Engagement, then BGSA ***will*** be appointed as its ongoing advisor for the Company, ***on the same terms as in this letter*** including paragraphs A and B unless otherwise mutually agreed, for as long as BGSA, Cambridge Capital or Gordon remains involved with the Company.

(D.E. 120-1 § C) (emphasis added).

As FreightHub has repeatedly admitted, a "Transaction" indisputably took place within the first twelve months of the Agreement. (*See, e.g.*, D.E. 126-2 17:10-14; 18:4–6; 59:14–18; 124:2–6, 11–15; 187:18–20); (D.E. 126-22); (D.E. 126-23). The terms of the Agreement, therefore, required FreightHub to appoint BGSA as its ongoing advisor. (D.E. 120-1 § C.) Notwithstanding the above, FreightHub has refused to acknowledge BGSA as its ongoing advisor. Axelrod testified:

> Q: . . . Did a transaction close as a result of the introductions made by BG Strategic Advisors.
>
> A: Yes.
>
> Q: So under this agreement BG Strategic Advisors was to be appointed an ongoing advisor.
>
> A: Yes.
>
> Q: And BG Strategic Advisors was not appointed an ongoing advisor.
>
> A: No.

(D.E. 126-4 29:5–14.) FreightHub will claim that BGSA was no longer "involved," and, therefore, FreightHub did not have to appoint BGSA as its ongoing advisor even after a Transaction occurred. *See* Section III.A. And, if that was not enough, as Gonzalez admitted during his deposition, involvement could encompass a myriad of things, even including the fact that Gordon, through BGSA Holdings, has been the registered holder of 80,000 non-voting common stock of FreightHub since January 21, 2020. (D.E. 126-6 135:12–14) ("I think as a, you know, significant shareholder

of course you're, you know, we have a relationship."); (D.E. 51-2).  Accordingly, if BGSA's repeated conversations with potential investors is not sufficient to encompass involvement as to continue the Parties' relationship under the terms of the Agreement, Gordon's involvement in FreightHub through his stock ownership certainly keeps him "involved."  And, again, even if FreightHub takes the position that the Agreement is terminable at will, FreightHub still breached the Agreement by failing to ever appoint BGSA as ongoing advisor.

Therefore, there are no genuine issues of material fact that would invalidate this, or any other, term of the Agreement.  It is undisputed that FreightHub materially breached the Agreement when FreightHub failed to appoint BGSA as its ongoing advisor.  For this reason, even if FreightHub's technical breach position was correct, FreightHub first breached when it failed to make the appointment, even though there was no dispute that BGSA was performing.

### c. *FreightHub Breached the Agreement by Failing to Pay BGSA*

The Agreement entitled BGSA to three distinct compensation components: (1) a retainer, (2) success fees, and (3) expense reimbursement.  (D.E. 120-1 § A.)  The retainer and success fees are the subject of the Amended Complaint.  (D.E. 51 ¶¶ 36–43.)  The terms for the retainer are as follows:

> BGSA's principal, Benjamin Gordon and/or his designees, will receive stock equal to 8% of the fully-diluted equity of the Company's stock, based on the total capitalization as of the date of the next Transaction. 50% of this equity shall vest upon the closing of the next Transaction. The remaining 50% of this equity shall vest upon the sooner of (a) the Company receiving introductions to at least 10 c-level executives to strategic companies in the supply chain sector, or (b) the Company receiving one introduction to a strategic client that generates meaningful revenue for the Company.

(D.E. 120-1 § A(1).)  The terms for the success fees are as follows:

> Upon consummation of any Transaction, the Company will pay BGSA a success fee equal to (a) 10% of capital raised for capital raises, loans, or investments, 7% of which shall be payable to BGSA by the Company in cash and the remaining 3% payable in fully-diluted equity of the Company's stock; or (b) 3% of the Company's Total enterprise value for sales, mergers, or changes of control. For the sake of clarity, BGSA shall not be entitled to a success fee for (i) the BGSA investment; or (ii) any funds received from any existing investor of the Company.
>
> --
>
> A Transaction shall be deemed consummated as of the date on which the Company delivers signed closing documents effecting a transaction (the "Closing"). The Success Fees shall be due immediately at the closing.

(D.E. 120-1 § A(2)–(3).

        i.    <u>FreightHub Failed to Pay BGSA Success Fees.</u>

The terms of the Agreement are clear that once BGSA was appointed as FreightHub's ongoing advisor, BGSA would be entitled to "10% of capital raised for capital raises, loans, or investments" and "3% of the Company's Total enterprise value for sales, mergers, or changes of control" for any non-preexisting investors. (D.E. 120-1 § A(2)(a)–(b).) As indicated above, BGSA should have been appointed as FreightHub's ongoing advisor and is, therefore, entitled to the compensation referenced herein. Importantly, FreightHub did, on one occasion, pay a success fee of sixteen thousand three hundred and sixty dollars ($16,360.00), acknowledging the validity of the Agreement and its responsibility for paying success fees to BGSA. (D.E. 126-21.) After that, however, FreightHub stopped paying.

Despite the language of the Agreement, however, BGSA was locked out of FreightHub by FreightHub and denied subsequent success fees. FreightHub's contentions that BGSA is requesting fees without doing any work are unfounded. BGSA provided more than just connection with potential investors—its reputation alone helped FreightHub. (D.E. 126-4 103:20–24; 105:5–21); (D.E. 126-5 116:20–21); (D.E. 126-6 98:3–11); (D.E. 126-14 at 1); (D.E. 126-33 at 2). For example, FreightHub used Gordon and BGSA's name to develop FreightHub's seriousness as a company:

> A: . . . We used that relationship to establish our seriousness as a company, or relationship with Ben. That was part of the relationship with Ben Gordon.
>
> Q: So you said that you used that relationship to establish the seriousness of FreightHub?
>
> A: Yes.
>
> Q: And even to investors that had nothing to do with Ben Gordon and BG Strategic Advisors you used the relationship with BG Strategic Advisors to establish the seriousness of the company.
>
> A: Yes.
>
> Q: And months later you closed a $4 million round; correct?
>
> A: Correct.
>
> Q: And then the company made the decision to terminate BG Strategic Advisors.
>
> A: Correct.

(D.E. 126-4 105:5–21.) Moreover, and perhaps more importantly, the Agreement specifically contemplates BGSA's entitlement to success fees "with *or without* [its] continued assistance."

(D.E. 120-1 § B (emphasis added)). This section is then incorporated into the terms for BGSA's position as ongoing advisor. (D.E. 120-1 § C ("BGSA will be appointed on the same terms as in this latter including paragraphs A *and B*") (emphasis added)).

As noted above, absent FreightHub's actions in affirmatively locking BGSA out of FreightHub, BGSA would still be FreightHub's exclusive advisor. FreightHub therefore breached the Agreement by failing to pay BGSA success fees under the Agreement. In fact, it is undisputed that numerous capital raises, loans, and/or investments occurred after FreightHub pushed BGSA out. (D.E. 119-1; 119-2). After reviewing and analyzing the documents *provided by FreightHub*, the BGSA Parties' damages expert determined that FreightHub owes BGSA success fees totaling $979,784.00, excluding the merger.[13] And, after Gordon requested clarification on such fees, FreightHub simply decided to ignore such requests with internal emails stating "not sure what/*if to answer him at all*" and "best for counsel I assume." (D.E. 126-28 (emphasis added)); (D.E. 126-27).

  ii.  <u>FreightHub Failed to Pay BGSA for its Merger.</u>

As an ongoing advisor, BGSA was also entitled to a percentage of the value of any merger. Specifically, BGSA was entitled to "3% of the Company's Total enterprise value for sales, *mergers*, or changes of control." (D.E. 120-1 § A(2)(b)) (emphasis added). On February 14, 2022, FreightHub merged with Hudson Capital. (D.E. 119-2 at 12). REDACTED (D.E. 126-2 119:2–7). It is undisputed that (1) the terms of the Agreement provided that BGSA would be appointed as FreightHub's ongoing advisor if a Transaction occurred and (2) a Transaction, in fact, occurred. As such, FreightHub was contractually obligated to compensate BGSA with 3% of the value of the Hudson Capital Merger "as of the date on which the Company delivers signed closing documents effecting a Transaction." (D.E. 120-1 § A(3).) FreightHub has provided no such compensation. This is yet another a breach of the Agreement.

  iii.  <u>FreightHub Created a Different Class of Stock Specifically for BGSA.</u>

Pursuant to the Agreement, BGSA's retainer was to be paid in FreightHub stock based on the total capitalization "as of the date of the next Transaction." (D.E. 120-1 § A(1).) As admitted by Gonzalez in an email on October 25, 2019, the "next Transaction" happened in "Spring 2018."

---

[13] This Motion is to liability only. The damage calculations are only included herein for reference and as a representation of FreightHub's liability under the Agreement.

(D.E. 126-11 at 1.)  According to the transaction documents, the specific date was February 27, 2018.  (D.E. 126-24.)  As such, Gordon was entitled to "8% of the fully-diluted equity of [FreightHub's] stock, based on the total capitalization" as of February 27, 2018.  (D.E. 120-1 § A(1).)  Instead, FreightHub created a diluted class of non-voting stock specifically for BGSA. (D.E. 51-2); (D.E. 126-2 170:7-14.)  FreightHub failed entirely to inform BGSA that it would be receiving non-voting stock.  (D.E. 126-6 164:11–181:12.)  Indeed, the stock provided to BGSA did not exist at the time that the Parties signed the Agreement.  (D.E. 126-2 170:7-14.)  BGSA understood that the stock that would be issued to BGSA would be of the same class as other shareholders, not that a new class of stock would be created for BGSA and placed below all other classes of stock.  (D.E. 126-5 65:22–66:19.)  FreightHub's failure to comply with the terms of the retainer fee language of the Agreement is indisputably a breach of the Agreement.

### d.  BGSA Suffered Damages from FreightHub's Breaches[14]

Finally, BGSA suffered damages as a result of FreightHub's failure to deliver the promised equity, failure to pay success fees, and failure to appoint BGSA as an ongoing advisor.  Therefore, no trier of fact could find that the elements of breach of contract are not met, and BGSA is therefore entitled to summary judgment on Count I of the Amended Complaint as a matter of law.

## IV.  The Court Should Issue a Declaration That Agreement is Valid, Binding, and Enforceable.

Count III of the Amended Complaint is a declaratory action asking the Court for a declaration that the Agreement is valid and enforceable.  (D.E. 51 ¶ 48(a), (b), (d).)  Count III also requests that the Court determine that FreightHub could not unilaterally terminate the Agreement without cause.  (D.E. 51 ¶ 48(c).)  "[A] complaint for declaratory relief must allege that: (1) there is a bona fide dispute between the parties; (2) the plaintiff has a justiciable question as to the existence or nonexistence of some right, status, immunity, power or privilege, or as to some fact upon which existence of such a claim may depend; (3) the plaintiff is in doubt as to the claim; and (4) there is a bona fide, actual, present need for the declaration.  *Mandarin Lakes Cmty. Ass'n, Inc. v. Mandarin Lakes Neighborhood Homeowners Ass'n, Inc.*, 322 So. 3d 1196, 1199 (Fla. 3d DCA 2021).  All elements have been met here.  (D.E. 51 ¶¶ 44–52.)

---

[14] BGSA is not moving for summary judgment on damages, as there are no doubt questions of fact to be resolved with respect to damages owed to BGSA.

"Competent persons have the utmost liberty of contracting and when these agreements are shown to be voluntarily and freely made and entered into, then the courts usually will uphold and enforce them." *Wechsler v. Novak*, 157 Fla. 703, 708 (1946). FreightHub knowingly, voluntarily, and intelligently entered into the Agreement with BGSA. It is undisputed that FreightHub had the opportunity to negotiate the terms of the Agreement and consult with a lawyer before it was finalized. (D.E. 126-4 11:16–18, 25; 12:1–15; 13:1–16); (D.E. 126-5 73:19–23); (D.E. 126-4 18:21–19:3; 19:10–13; 20:1–5; 21:3–5); (D.E. 126-2 22:7–10, 14–15; 25:6–20); (D.E. 126-25); (D.E. 126-26.). In other words, FreightHub was well-aware of the validity of the Agreement and its own contractual obligations thereunder. FreightHub has even acknowledged the Agreement's validity at the time it was executed. (D.E. 126-2 31:17–25); (D.E. 126-6 22:7–11). Freudenthaler specifically testified:

> Q: . . . What does this paragraph I'm selecting here say?
>
> A: If this agreement reflects the terms of our engagement please sign below and return to me at your earliest convenience.
>
> Q: Is that a signature for FreightHub?
>
> A: That is a signature by Mr. Axelrod, yes.
>
> Q: FreightHub agreed that this was the terms of the engagement?
>
> A: As did Mr. Gordon, yes.

(D.E. 126-2 31:17-32:1.)

As noted herein, there is no genuine dispute as to the validity of the Agreement and no genuine dispute as to the invalid attempted termination of the Agreement. Accordingly, the Agreement remains in effect, and no trier of fact could find in FreightHub's favor. BGSA, therefore, continues to be entitled to performance under the Agreement, and it cannot be disputed that a declaration in BGSA's favor is proper. Summary judgment on Count III should be granted as a matter of law.

### V.     FreightHub Fails To Meet Its Burden of Establishing Its Affirmative Defenses.

"An affirmative defense is one that admits to the complaint, but avoids liability, wholly or partly, by new allegations of excuse, justification, or other negating matters." *Adams v. Jumpstart Wireless Corp.*, 294 F.R.D. 668, 671 (S.D. Fla. 2013). When a plaintiff moves for summary judgment on a defendant's affirmative defense, "the defendant bears the initial burden of showing that the affirmative defense is applicable." *Off. of Thrift Supervision v. Paul*, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997). "The defending party must rely on or submit record evidence in support of

the purported affirmative defenses to create a genuine issue of material fact preventing the entry of summary judgment." *United States v. Marder*, 208 F. Supp. 3d 1296, 1318 (S.D. Fla. 2016) (citation omitted). "Only upon such a showing does the burden shift to plaintiff regarding that affirmative defense." *Off. of Thrift Supervision*, 985 F. Supp. at 1470. With the burden shifting to the plaintiff, "[a] court may grant partial summary judgment on an affirmative defense if the plaintiff shows that the defendant cannot maintain the defense by a preponderance of the evidence." *Anderson v. Mascara*, 347 F. Supp. 3d 1163, 1175 (S.D. Fla. 2018). "Where there are no facts pled to support general allegations of affirmative defenses, the defenses are legally insufficient." *Leal v. Deutsche Bank Nat. Trust Co.*, 21 So. 3d 908, 909 (Fla. 3d DCA 2009).

### a. FreightHub's First Affirmative Defense—Full Performance

FreightHub's first affirmative defense is full performance. (D.E. 53 at 4.) FreightHub claims that it has fully performed by paying all compensation owed (D.E. 53 at 4) but ***provides no documentary evidence of such payment***. There is no doubt that FreightHub did not fully perform under the Agreement as the facts already stated herein confirm that compensation is still very much due and owing to BGSA.

### b. FreightHub's Second Affirmative Defense—Illegality

As its second affirmative defense, FreightHub asserts illegality. (D.E. 53 at 4.) An illegal contract is one that's terms "violate[] a provision of the constitution or a statute." *Harris v. Gonzalez*, 789 So. 2d 405, 409 (Fla. 4th DCA 2001). FreightHub has provided no evidence to support this, only a long list of allegations that it repeats throughout its affirmative defenses and that have been unequivocally disproven herein:

> Plaintiff's failing to comply with applicable securities regulations; Plaintiff or its affiliates' failure to remain involved with Defendant; the failure of Plaintiff or its affiliates or designees to invest in Defendant; Plaintiff's false statements regarding its registration status, its intention to invest in Defendant, and concealment of all facts and information relating to the SEC's investigation and subsequent Order against Gordon; Plaintiff's failure to identify conflicts of interest among BGSA and its affiliates acting as investment advisors and investors; Plaintiff's failure to meet the threshold requirements for payment of the "Retainer" under the alleged agreement; and Plaintiff's failure to provide any ongoing services to Defendant or to otherwise meet any of its obligations under the alleged agreement, including with respect to engaging in any efforts to find a "Transaction" or multiple "Transactions" acceptable to Defendant.

(D.E. 53 at 4.)   These allegations (the "Boilerplate Allegations") are all legally and factually insufficient for each affirmative defense that FreightHub tries to use them for.

First, it is undisputed (and discussed in more detail *infra*) that BGSA is not an investment adviser—which is a prerequisite for compliance with the Investment Advisers Act of 1940.  (*See, e.g.*, D.E. 120-1 § O.)  Second, it is undisputed that BGSA was involved with FreightHub through at least October 2019.  (D.E 126-4 63:23; 118:3–9); (D.E. 126-2 186:15–20) (D.E. 126-11 at 3, 8, 9); (D.E. 126-16 at 1, 2); (D.E. 126-17 at 1, 3, 4).

Third, it is undisputed that the Agreement only contemplates that BGSA or its affiliates "intends" on investing in FreightHub.  (D.E. 120-1 p. 1.)  It is curious that FreightHub seeks to avoid the Agreement's plain language and read in a certainty requirement when there simply is none as written.

Fourth, the Agreement was between FreightHub and BGSA, not FreightHub and Gordon.[15] (D.E. 120-1 p. 4); (D.E. 126-2 26:20–24).  Fifth, FreightHub was aware of BGSA's relationship with Cambridge Capital because the Agreement expressly identified it.  (D.E. 120-1 § C ("for as long as BGSA, ***Cambridge Capital***, or Gordon remains involved with the company") (emphasis added)).

Sixth, it is undisputed that at least one "Transaction" occurred and that BGSA introduced FreightHub to at least one strategic client, thereby entitling BGSA to the full retainer under the Agreement. (D.E. 126-2 at Ex. 4); (D.E. 126-2 17:10–14; 18:4–6; 59:14–18; 124:2–6, 11–15; 187:13–17); (D.E. 126-4 27:16–28:4; 29:5–14; 47:7–15); (D.E. 126-17 at 11); (D.E 126-8); (D.E. 126-11 at 1, 7, 10).  And lastly, it is undisputed that BGSA performed its obligations under the Agreement, as set forth in the preceding sections.  Importantly, all of the Boilerplate Allegations have to do with performance under the Agreement, ***not*** the terms of the Agreement itself.  FreightHub has produced no evidence upon which a trier of fact could render the Agreement illegal.

FreightHub also attempts to claim that the Agreement is illegal for violation of the Investment Advisers Act of 1940 as a result of Gordon's SEC suspension.  This is verifiably false for three reasons.  First, as previously noted, Gordon was not a party to the Agreement.  Second, at all times material, BGSA was a registered broker-dealer. (D.E. 126-7 136:21–137:4); (D.E. 114

---

[15] As such, Gordon's SEC investigation did not and should not have affected the relationship between BGSA and FreightHub.

¶ 5) (D.E. 121-1).   Third, Axelrod, the former FreightHub CEO, admitted that the attempted termination had nothing to do with Gordon's SEC suspension.   Therefore, an irrelevant suspension—which would not even constitute cause under the Agreement--cannot be the basis for FreightHub's argument that the Agreement is illegal.  (D.E. 126-4 131:16-19).  It is also important to note that the SEC suspension was agreed to *after* FreightHub first attempted to terminate the Agreement.  (D.E. 126-15.)  Therefore, FreightHub simply cannot support an illegality defense.

### c.  *FreightHub's Third Affirmative Defense—Unclean Hands*

FreightHub's third affirmative defense is unclean hands.  (D.E. 53 at 5.)  However, the evidence here fails to establish that BGSA acted with unclean hands.   As an initial matter, this affirmative defense contains the same exact Boilerplate Allegations as FreightHub's second affirmative defense, and, therefore, fails for the same reasons indicated above.   Moreover, like fraud, unclean hands "is not so subtle a concept that it cannot be described with precision*.*" *Flemenbaum v. Flemenbaum*, 636 So. 2d 579, 580 (Fla. 4th DCA 1994).  To state an unclean hands affirmative defense, merely proving condemnable conduct is not enough; "[a] party must also prove three other 'elements': (1) reliance on the conduct; (2) relation to the litigation; (3) resulting in an injury." *U.S. Bank Nat'l Ass'n as Tr. for C-Bass Mortg. Loan Asset-Backed Certificates, Series 2006-CB8 v. Qadir*, 342 So. 3d 855, 859 (Fla. 1st DCA 2022).  As FreightHub's affirmative defense does not reference reliance or injury, nor has any been advanced in discovery, FreightHub has not met—and cannot meet—its burden for this affirmative defense to survive summary judgment.

If this was not enough, FreightHub's basis for its unclean hands defense is simply a thinly veiled, unsupported, breach of contract claim.  (D.E. 53 at 5).  *See also Cong. Park Office Condos II, LLC v. First-Citizens Bank & Tr. Co.*, 105 So. 3d 602, 610 (Fla. 4th DCA 2013) ("**a breach of contract** . . . may not be nice . . . but it **does not amount to unclean hands**.") (emphasis added). The unclean hands affirmative defense also notes that Gordon individually, not BGSA, was the subject of a SEC settlement, well after the execution of the Agreement.  (D.E. 53 at 5.)  Not a single allegation in the unclean hands affirmative defense suggests that BGSA defrauded FreightHub or acted inequitably in any regard.  Therefore, this affirmative defense fails as a matter of law.

### d. *FreightHub's Fourth Affirmative Defense—Failure to Mitigate Damages*

FreightHub's fourth affirmative defense is failure to mitigate damages, where FreightHub claims that BGSA "waited for [FreightHub] to undertake one or more subsequent transactions before commencing this civil action."  (D.E. 53 at 6.)  Importantly, "[t]here is no actual 'duty to mitigate,' because the injured party is not compelled to undertake any ameliorative efforts."  *Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 982 (Fla. 2009).  Additionally, mere waiting is not a failure to mitigate damages.  If waiting was, then FreightHub itself failed to mitigate its damages by waiting to bring its counterclaims against BGSA, BGSA Holdings, and Gordon.

And, FreightHub ignored BGSA's attempts to resolve this without a suit, with internal emails stating "not sure what/***if to answer him at all***" and "best for counsel I assume." (D.E. 126-28 (emphasis added)); (D.E. 126-27.)  As a result, BGSA only commenced this action after it became obvious that FreightHub was not going to follow through on FreightHub's obligations under the Agreement.  As FreightHub provides no other evidence to prove that BGSA failed to mitigate its damages, this defense fails.

### e. *FreightHub's Fifth Affirmative Defense—Laches*

FreightHub asserts laches as its fifth affirmative defense.  (D.E. 53 at 6.)  The doctrine of laches is premised "upon unreasonable delay in enforcing a right, coupled with a disadvantage to the person against whom the right is sought to be asserted."  *Bethea v. Langford*, 45 So. 2d 496, 498 (Fla. 1949); *see also Dean v. Dean*, 665 So. 2d 244, 247 (Fla. 3d DCA 1995) (explaining laches requires proof of, inter alia, delay on the part of the plaintiff and injury or prejudice to the defendant).  "Lapse of time alone is insufficient to support a finding of laches."  *Smith v. Town of Bithlo*, 344 So. 2d 1288, 1288-89 (Fla. 4th DCA 1977).  In this affirmative defense, FreightHub claims that BGSA delayed bringing this lawsuit because "[BGSA] has not had any meaningful involvement with [FreightHub] since November 2018" and only commenced this action after the merger announcement.  (D.E. 53 at 6.)  This could not be further from the truth.  Once again, BGSA only commenced this action after it became obvious that FreightHub was not going to follow through on its obligations under the Agreement.  Moreover, the email train in this case is clear: BGSA was sending emails to potential investors way past November 2018.  FreightHub cannot offer any evidence to establish that BGSA unreasonably delayed at all, let alone in a manner resulting in prejudice.

Moreover, if FreightHub attempts to meets its initial burden on this affirmative defense, there are dozens of emails between FreightHub and Gordon showing that Gordon was attempting to resolve this matter for years—instead of acknowledging this to defeat the laches affirmative defense, however, FreightHub claims that Gordon breached his agreed-to SEC suspension by virtue of the attempts to resolve the matter with FreightHub from July 2019 to July 2020. Therefore, the laches affirmative defense fails.

### f. *FreightHub's Sixth Affirmative Defense—Speculative Damages*

FreightHub's next affirmative defense is speculative damages, claiming that BGSA's damages are speculative because "not all of the transactions . . have been consummated." (D.E. 53 p. 7.)  As the record is clear, the merger between FreightHub and Hudson Capital was closed on February 14, 2022.  (D.E. 119-2 at 12.)  As such, there can be no genuine issue of material fact that BGSA is entitled to concrete damages.  FreightHub has not and cannot produce any evidence to dispute this fact.  The fact that the Parties are in dispute as to the amount of such damages does not preclude summary judgment.  *See McCall v. Sherbill*, 68 So. 2d 362, 364 (Fla. 1953) ("[D]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient that there be a reasonable basis of computation although the result may be only approximate.") (citation omitted).  Accordingly, FreightHub has not met its burden as to the sixth affirmative defense of speculative damages.

### g. *Seventh Affirmative Defense—Accord and Satisfaction*

FreightHub's seventh affirmative defense is accord and satisfaction.  (D.E. 53 at 7.)  In this defense, FreightHub claims that it delivered 80,000 shares of common stock to Holdings and, therefore, FreightHub's obligation under the Agreement was satisfied.  (D.E. 53 at 7.)  There are two elements of accord and satisfaction: (1) the parties mutually intend to settle an existing dispute by entering into a superseding agreement and (2) actual performance with satisfaction of the new agreement.  *U.S. v. Morrison*, 28 So. 3d 94, 101 (Fla. 1st DCA 2009).  Additionally, "the new agreement ***must be executed*** in order to have the effect of satisfaction, and if it is not executed, the new agreement does not bar an action based upon the original agreement."  10 Fla.Jur.2d Compromise, Accord, and Release s. 7 (1979) (emphasis added).  As an initial matter, FreightHub was already obligated to provide shares to BGSA—or BGSA's designee—and, therefore, there was no "superseding agreement." (D.E. 120-1 § A(1).)  Moreover, the shares that were provided to BGSA were diluted and of a lower class and did not satisfy the requirements under the

Agreement.  (D.E. 126-5 65:22–66:19); (D.E. 126-7 48:3–9.)  FreightHub has provided no evidence of any agreement by BGSA to accept such lesser stock—because no such agreement exists.  As such, there has been no accord and satisfaction as a matter of law.

### h.   *FreightHub's Eighth Affirmative Defense—Condition Precedent*

FreightHub asserts condition precedent as its eighth affirmative defense.  (D.E. 53 at 7.)  This affirmative defense perfectly exemplifies FreightHub's approach to contract interpretation.  "Where, as here, it is unclear whether alleged conditions precedent apply, the burden is on the party asserting the existence of the conditions precedent to establish their applicability."  *Diaz v. Wells Fargo Bank, N.A.*, 189 So. 3d 279, 285 (Fla. 5th DCA 2016).  Once again, FreightHub offers no explanation or proof that any conditions precedent apply to the Agreement—because no such conditions exist.  Instead, FreightHub introduces the same Boilerplate Allegations in support of its condition precedent defense.   The Boilerplate Allegations have been factually disproven repeatedly throughout this motion and fail for the same reasons reiterated herein.  Therefore, this affirmative defense fails.

### i.   *FreightHub's Ninth Affirmative Defense—Uncertainty*

In its ninth affirmative defense, FreightHub claims that the terms "Transaction," "Retainer," and the Agreement's term and termination are uncertain.  (D.E. 53 at 8–9.)  This is verifiably false by the terms of the Agreement itself.  First, "Transaction" is unmistakably defined in the Agreement.  (D.E. 120-1 p. 1); (D.E. 126-4 28:21-23).  Second, there are two (2) explicit ways that BGSA is entitled to a retainer.  (D.E. 120-1 § A(1)(a), (b).)  Third, the fact that the Agreement does not allow for termination without cause does not void the contract, especially when FreightHub (on numerous occasions) agreed to the Agreement's terms.  *See McArthur v. A.A. Green & Co. of Fla. Inc.*, 637 So. 2d 311, 311-12 (Fla. 3d DCA 1994) (enforcing a contract with a provision that allowed termination "only for cause").  Lastly, and despite FreightHub's best efforts otherwise, the Agreement contains a detailed termination clause.  (D.E. 120-1 § C.)

Although there is no defined term for the ongoing advisor relationship, the law imposes a reasonable time if a contract does not expressly fix the time for performance.  *See Sound City, Inc. v. Kessler*, 316 So. 2d 315, 318 (Fla. 1st DCA 1975) ("in the absence of an express provision as to duration in a contract, the intention of the parties with respect to duration and termination is to be determined from the surrounding circumstances and by application of a reasonable construction of the agreement as a whole and that if it appears that no termination was within the contemplation

of the parties, or that their intention with respect thereto cannot be ascertained, the contract will be terminable within a reasonable time depending upon the circumstances and that it may not be terminated by either party without first giving reasonable notice."). Moreover, the surrounding circumstances and conduct of the Parties here, through the Parties' course of dealings, clearly support that the manifest intent of the Parties was to have an enforceable contract until a change in control of FreightHub. (D.E. 126-6 131:18–132:7.)

Therefore, the terms that FreightHub claims are "uncertain" are actually quite certain. In fact, the Agreement clearly explains every one of them. FreightHub has provided no proof otherwise and has failed to meet its burden to prove uncertainty.

> ### j. FreightHub's Tenth Affirmative Defense—Estoppel

FreightHub's tenth affirmative defense is estoppel. (D.E. 53 at 8.) The elements of an estoppel defense are (1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon. *Justice Admin. Comm'n v. Berry*, 5 So. 3d 696, 699 (Fla. 3d DCA 2009). The reason that this defense fails is simple: there are no facts pled or proven to support an estoppel defense. (D.E. 53 at 8.) The evidence exchanged in the course of this lawsuit does nothing to save the estoppel affirmative defense.

> ### k. FreightHub's Eleventh Affirmative Defense—Lack of Adequate Assurance

FreightHub asserts lack of adequate assurance as its eleventh affirmative defense, asserting the same exact Boilerplate Allegations. This defense therefore fails for the same reasons that every affirmative defense that relies upon the Boilerplate Allegations fails. Moreover, FreightHub does not provide any evidence that it ever requested adequate assurances and therefore cannot meet its burden of proving affirmative defense number eleven.

> ### l. FreightHub's Twelfth Affirmative Defense—Prior Breach

FreightHub asserts prior breach as its twelfth affirmative defense, once again asserting the same exact Boilerplate Allegations. (D.E. 53 at 8.) This defense therefore fails for the same reasons that every affirmative defense that relies upon the Boilerplate Allegations fails. Nonetheless, the Agreement is clear—to terminate, FreightHub was required to provide BGSA with notice and an opportunity to cure. (D.E. 120-1 § C.) As FreightHub has provided ***no evidence*** that it did, in fact, provide such notice and an opportunity to cure (because FreightHub did not), there must not have been a prior breach.

*m.   FreightHub's Thirteenth Affirmative Defense—Unconscionability*

FreightHub's thirteenth affirmative defense is unconscionability, alleging that the Agreement "can only be terminated under very limited circumstances and otherwise requires the payment of fees indefinitely irrespective of [BGSA's] rendition of any services."  (D.E. 53 at 9.) "Before a court may hold a contract unconscionable, it must find that it is both procedurally and substantively unconscionable." *Gainesville Health Care Ctr., Inc. v. Weston*, 857 So. 2d 278, 284 (Fla. 1st DCA 2003) (citations omitted).  To determine whether a contract is procedurally unconscionable, a court must look to the "circumstances surrounding the transaction" to determine whether the complaining party had a "meaningful choice" at the time the contract was entered. *Id.* (citation omitted).  "Among the factors to be considered are whether the complaining party had a realistic opportunity to bargain regarding the terms of the contract, or whether the terms were merely presented on a 'take-it-or-leave-it' basis; and whether he or she had a reasonable opportunity to understand the terms of the contract."  *Gainesville Health Care Ctr., Inc.*, 857 So. 2d at 285.  To determine whether a contract is substantively unconscionable, a court must look to the terms of the contract, itself, and determine whether they are so "outrageously unfair" as to "shock the judicial conscience."  *See, e.g.*, *Belcher v. Kier*, 558 So.2d 1039, 1043 (Fla. 2d DCA 1990) (declining to equate "unconscionability" with mere "unreasonableness").

As a threshold matter, the Agreement cannot be procedurally unconscionable because FreightHub participated in negotiations of the terms of the Agreement and was represented by counsel during such negotiations.  (D.E. 126-4 11:16–18, 25; 12:1–15; 13:1–16); (D.E. 126-5 73:19–23); (D.E. 126-6 18:21–19:3; 19:10–13; 20:1–5; 21:3–5); (D.E. 126-2 22:7–10, 14–15; 25:6–20); (D.E. 126-25); (D.E. 126-26).  Additionally, FreightHub has produced no evidence to create a genuine dispute that the Agreement is not substantially unconscionable.  Therefore, FreightHub's thirteenth affirmative defense does not meet its burden of production and is insufficient to preclude summary judgment.

*n.   FreightHub's Fourteenth Affirmative Defense—Impossibility*

As its fourteenth affirmative defense, FreightHub claims that it is impossible for FreightHub to perform under the Agreement.  (D.E. 51 at 9.)  "Impossibility of performance refers to those factual situations, too numerous to catalog, where the purposes, for which the contract was made, have, on one side, become impossible to perform."  *Home Design Ctr.--Joint Venture v. Cnty. Appliances of Naples, Inc.*, 563 So. 2d 767, 770 (Fla. 2d DCA 1990).  Once again,

FreightHub includes no facts to support such defense.  Moreover, this affirmative defense is negated itself by the fact that FreightHub did, on one (1) occasion, pay a success fee of $16,360.00, acknowledging the validity of the Agreement and FreightHub's responsibility for paying success fees to BGSA.  (D.E. 126-21.)  It is curious how FreightHub's performance of the Agreement can be impossible if it has previously performed thereunder.

> o.  *FreightHub's Fifteenth Affirmative Defense—Liquidated Damages*

For its fifteenth affirmative defense, FreightHub asserts that the amounts sought by BGSA under the Agreement constitute liquidated damages.  (D.E. 53 at 9.)  FreightHub points to no arrangement of the Parties or provision in the Agreement referencing liquidated damages.  As indicated herein, the damages sought by BGSA are those it is entitled to under the terms of the Agreement.  FreightHub has produced no evidence to indicate otherwise.  Therefore, FreightHub's fifteenth affirmative defense fails.

> p.  *FreightHub's Sixteenth Affirmative Defense—Agreement is Void and/or Unlawful*

As its last affirmative defense, FreightHub asserts that the Agreement is void and/or unlawful as being a restraint on trade or commerce under Chapter 542 of the Florida Statutes.  (D.E. 53 at 9.)  FreightHub has repeatedly acknowledged the existence and validity of the Agreement throughout the course of this lawsuit, including when it paid BGSA certain success fees as required by the Agreement.  (D.E. 126-2 18:23-29:14); (D.E. 126-21).  Further, the Parties had the opportunity to negotiate the terms of the Agreement and, eventually, come to a meeting of the minds on the essential terms.  (D.E. 126-4 11:16–18, 25; 12:1–15; 13:1–16); (D.E. 126-5 73:19–23); (D.E. 126-6 18:21–19:3; 19:10–13; 20:1–5; 21:3–5); (D.E. 126-2 22:7–10, 14–15; 25:6–20); (D.E. 126-25); (D.E. 126-26)  FreightHub even had the opportunity to have legal counsel review the Agreement:

> Q: Is it the companies position, not your knowledge, is it the company's position that did or did not negotiate on that engagement letter?
>
> A: It did negotiate the engagement letter, yes.
>
> Q: And the company had legal counsel involved at the time?
>
> A: Yes.
>
> Q: And the companies legal counsel reviewed that engagement letter prior to its execution?
>
> A: Given the red lines I would assume so, yes.

Q: You would assume so, but is it the company's position that its legal counsel reviewed the engagement letter prior to execution?

A: Yes.

(D.E. 126-2 25:6–20.)  As there is no genuine dispute as to the ability to negotiate the Agreement, there are no issues that would invalidate the Agreement.  Additionally, FreightHub provides no evidence to support its allegation that the Agreement constitutes a restraint on trade.  (D.E. 53 at 9.)  As noted above, the duration of the contract can be determined by the conduct and intentions of the Parties.  Therefore, FreightHub's sixteenth affirmative defense fails.

### q.  Affirmative Defenses-Conclusion

Because FreightHub fails to meet its burden on any of its sixteen affirmative defenses and creates no genuine dispute of material fact, BGSA's Motion for Summary Judgment as to the Amended Complaint should be granted as a matter of law.

## BGSA PARTIES' MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT ON FREIGHTHUB'S COUNTERCLAIMS

### I.    The BGSA Parties are Entitled to Summary Judgment on Counter Claims I, II, and V Because BGSA was a Broker-Dealer, not an Investment Adviser.

FreightHub alleges Counterclaims for violation of the Investment Advisers Act of 1940 against BGSA, breach of fiduciary duty against BGSA, and aiding and abetting against Gordon in Counts I, II, and V, respectively.  (D.E. 53 ¶¶ 154-93, 212-20.)  These Counterclaims are included together because the Counterclaims all rely on the same improper assumption:  That BGSA is an investment adviser.  None of the allegations in the Amended Counterclaim meet FreightHub's burden of establishing any genuine issue of material fact regarding Counterclaims I, II, and V.

### a.  Relevant Law

First, a cause of action under the Investment Advisers Act of requires an action against an "investment adviser."  15 U.S.C. 80b-6 ("It shall be unlawful for any *investment adviser*") (emphasis added).  Second, the elements of a breach of fiduciary duty claim are (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach.  *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1342 (M.D. Fla. 2006) (granting summary judgment on a breach of fiduciary duty claim where the complainant failed to show the existence of any fiduciary duty that was breached) (citations omitted).  Importantly, a party may waive a breach of fiduciary duty claim.  *Band v. Libby*, 113 So. 3d 113, 115 (Fla. 2d DCA 2013) ("Parties, by their own knowledge and conduct, can waive or be estopped to raise a wide array of

constitutional, statutory, and common law rights") (citation omitted). Lastly, the elements of a cause of action for aiding and abetting are (1) existence of the underlying wrongdoing; (2) knowledge of the wrongdoing by the aider and abettor; and (3) the aider and abettor's substantial assistance in the wrongdoing. *See Gilison v. Flagler Bank*, 303 So. 3d 999 (Fla. 4th DCA 2020). A cause of action for aiding and abetting breach of fiduciary duty requires a fiduciary duty on the part of the primary wrongdoer. *See Grape Leaf Capital, Inc. v. Lafontant*, 316 So. 3d 760, 761 n.2 (Fla 3d DCA 2021).

### b. Distinction Between Broker-Dealers and Investment Advisers

As noted in Dr. Paulukaitis' Report (D.E. 114-1), the Financial Planning Coalition differentiates between broker-dealers and investment advisers as follows:

> Broker-dealers . . . are not required to provide services to their clients under the fiduciary standard of care. Instead, broker-dealers provide services under the "suitability standard of care," which generally requires only that the broker-dealer's reasonable belief that any recommendation is suitable for the client. It is important to recognize that a financial recommendation that is "suitable" for a client (as legally required for broker-dealers) may not be a financial recommendation that is in the client's best interest (as legally required for investment advisers).[16]

Roel Campos, the former SEC Commissioner, similarly contrasted the duties of an investment adviser and a broker-dealer:

> Brokers who become investment advisers have to play by and addition set of rules, and those rules are generally stricter. Advisers Act was drawn largely from the common law of fiduciaries. They owe their clients a "fiduciary duty." They must avoid conflicts of interest with their clients, which means putting them first, or at least disclosing the conflict of interest so the client can take steps to protect himself. Brokers must treat clients fairly, but unless they establish a special relationship with the client, are generally not held to the same duty as an adviser.[17]

### c. The BGSA Parties are Broker-Dealers Not Investment Advisors

There is no genuine issue of material fact as to whether Gordon and/or BGSA were investment advisers. They are not, and never were, investment advisers. In fact, the Agreement specifically makes sure to refer to BGSA as an "advis<u>or</u>" not "advis<u>er</u>." (D.E. 120-1). This distinction was intentional; Gordon knew the distinction when the Agreement was drafted, and

---

[16] https://financialplanningcoalition.com/issues/fiduciary-standard-of-care/.
[17] *Remarks Before the National Association of Securities Professionals 1st Annual Legislative Symposium*, Roel C. Campos, March 29, 2006.

FreightHub agreed to such language.  Because the Act is the Investment Advis<u>ers</u> Act of 1940, it cannot be disputed that, if BGSA and/or Gordon were not investment advisers, there was no heightened duty placed on them.  Nothing in the Agreement creates a heightened duty on behalf of BGSA or suggests that BGSA's role was to provide securities advice to FreightHub.  Moreover, the Agreement specifically states that BGSA has no fiduciary duty to FreightHub and specifically forecloses the possibility of advice.  (D.E. 120-1 §§ F, O.)

As a threshold matter, BGSA is registered with the SEC and FINRA as a broker-dealer. (D.E. 126-7 136:21–137:4); (D.E. 114 ¶ 5) (D.E. 121-1).  BGSA was not and is not registered as investment adviser nor does it function as an investment adviser.  (D.E. 126-2 98:2–10; 190:6–9); (D.E. 126-4 156:4–22; 174:14–21); (D.E. 126-5 171:21; 206:20–207:5) (D.E. 114-1 at 8, 12). Nonetheless, FreightHub still counterclaims under the Investment Advisers Act and for breach of fiduciary duty and aiding and abetting.  (D.E. 53 ¶¶ 154–93, 212–20.)

The Investment Advisers Act of 1940 defines an "investment adviser" as any person who, "for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities[.]"  15 U.S.C. § 80b-2(11).  FreightHub's arguments are simply foreclosed because neither Gordon nor BGSA were an investment adviser as defined by the Act.  Furthermore, neither Party provided FreightHub with investment advice. (D.E. 126-2 98:2-10; 190:6-9); (D.E. 126-4 156:4-22; 174:14-21); (D.E. 126-5 171:21; 206:20-207:5).

Importantly, the Agreement specifically states:

The scope of BGSA's engagement shall be limited to matters expressly set forth in this letter agreement, and shall not include tax, legal, regulatory, accountancy or other specialist or technical advice or associated services

(D.E. 120-1 § O.)  As FreightHub testified that the terms of the Agreement represented the Parties' agreement (D.E. 126-2 31:17-25), BGSA was never intended to be an investment adviser under the Agreement.  FreightHub ___**has not provided a single piece of evidence**___ to prove that either Gordon *or* BGSA advised FreightHub as to the value of securities or whether FreightHub should invest, purchase, or sell securities—which is what the definition of investment adviser

contemplates.[18]   In fact, FreightHub's corporate representative unequivocally testified to the following:

> Q: What specific securities advice did Ben Gordon provide FreightHub?
>
> A: ***I don't know.***
>
> Q: What specific securities did BG Strategic did BG Strategic Advisers provide FreightHub?
>
> A: ***I don't know.***
>
> Q: What specific advice did Shai Greenwald provide to FreightHub?
>
> A: ***I don't know.***

(D.E. 126-2 98:2–10) (emphasis added).   FreightHub is now bound by these "I don't know" answers and cannot provide conclusory evidence to the contrary.  *See QBE Ins. Corp.*, 277 F.R.D. at 688.  As such, there can be no dispute that neither BGSA nor Gordon were investment advisers. Freudenthaler even continues to say:

> Q: Did BG Strategic Advisors ever tell the company that it should purchase certain securities?
>
> A: I haven't seen any indication of that.
>
> --
>
> Q: . . . did BG Strategic Advisors ever advise FreightHub to sell assets that would have been securities that were not just capital in FreightHub?
>
> A: No.

(D.E. 126-2 189:23–25; 190:6–9.)  Nonetheless, FreightHub still attempts to use BGSA's and Gordon's published investment reports as a way to pin the title of advisor on them.  (D.E. 53 ¶¶ 53–59.)  FreightHub has since admitted, however, that it never even looked at such reports before the Parties entered into the Agreement. (D.E. 126-2 97:3–16.)

If the Court disagrees, however, the Investment Advisers Act of 1940 specifically lays out an exception for "any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor[.]"  15 U.S.C. § 80b-2(11)(C); *see also Sec. & Exch. Comm'n v. Nat'l Exec. Planners, Ltd.*, 503 F. Supp. 1066, 1074 (M.D.N.C. 1980) (explaining that where investment advice that corporation gave was incidental to conduct of selling investment instruments and other investment products, corporation was not an "investment adviser" within meaning of the Investment Advisers

---

[18] 15 U.S.C. § 80b-2(a)(11).

Act).  As admitted by FreightHub, any alleged "advice" that was given by BGSA and/or Gordon could thus fit into this exception. (D.E. 126-4 174:22–25.)

> d.   *FreightHub Fails to Meet its Burden to Prove Counterclaims I, II, V*

Counterclaim I is an alleged violation of the Investment Advisers Act of 1940 claim against BGSA.  (D.E. 53 ¶¶ 154-75.)  As it cannot be disputed that BGSA is *not* an investment adviser under the Act, as set forth in the preceding section, no trier of fact could find that such violation occurred.

Counterclaim II is a claim for breach of fiduciary duty against BGSA, basing such duties on BGSA's role as an investment adviser. (D.E. 53 ¶¶ 176–93.)  FreightHub waived such claim because the Agreement expressly states that BGSA is ***not*** a fiduciary "to the Company or its stockholders in connection with the performance of services."  (D.E. 120-1 § F); *see also Band*, 113 So. 3d at 115.  Additionally, no fiduciary duty can be established from BGSA's role as an adviser because, as established above, it did not ever attempt or purport to act as an *investment* adviser to FreightHub.  As it cannot be disputed that BGSA is not an investment adviser, no trier of fact could find that BGSA breached any such fiduciary duties.

Counterclaim V is asserted against Gordon for allegedly aiding and abetting BGSA in breaching fiduciary duties.  (D.E. 53 ¶¶ 212–20.)  To be liable for aiding and abetting, an underlying violation must have occurred.  *See, e.g.*, *Grape Leaf Capital, Inc.*, 316 So. 3d 760, at 761 n.2 (noting that a wrongful act done by a "primary wrongdoer" is an element of a claim for aiding and abetting).  As a threshold matter, there can be no primary wrongdoer because no breach of fiduciary duty occurred.  Therefore, no trier of fact could find that Gordon aided and abetted, and the BGSA Parties are entitled to summary judgment as a matter of law.

> e.   *SEC Suspension, Cambridge Capital*

As noted above, FreightHub's aiding and abetting Counterclaim against Gordon is negated simply by the fact that BGSA did not owe FreightHub a fiduciary duty.  Nonetheless, the BGSA Parties are inclined to respond to FreightHub's lumped-in allegations that Gordon failed to comply with his SEC suspension and failed to disclose alleged conflicts of interest in the Counterclaim. (D.E. 53 ¶ 219.)  As a threshold matter, such allegations do not establish a Counterclaim for aiding and abetting.  Moreover, and perhaps most importantly, such allegations are simply baseless.

On June 20, 2019, Gordon entered a no-admit, no-deny settlement (the "Settlement") with the Securities and Exchange Commission.  (D.E. 126-5 130:18–131:7); (D.E. 121-2).  The

Settlement was accompanied by a twelve month suspension wherein Gordon was prohibited from associating with any broker-dealer. (D.E. 121-2.)   The Settlement was public information. (D.E. 121 ¶¶ 5, 8.)   According to BGSA's former compliance officer, Alexander Noskov ("Noskov"), the BGSA Parties meticulously complied with the terms of the Settlement, including the suspension.  (Ex. 5, Noskov Depo. 43:16–44:5; 44:11–14; 61:3–17; 91:8–92:5; 96:18–97:5; 104:1–105:13).   In fact, Gordon's management authority in BGSA was transferred to Massimo to ensure that Gordon would not be involved in a broker-dealer.  (D.E. 126-7 114:24–115:15); (D.E. 126-3 15:10–15; 43:16–44:5, 44:11–14; 61:3–17; 91:8–92:5; 96:18–97:5; 105:1–105:13).   **At all times material, the entity working with FreightHub—*BGSA*—remained a registered broker-dealer**.  (D.E. 126-7 136:21–137:4); (D.E. 114 ¶ 5); (D.E. 121-1).   Therefore, FreightHub has provided no evidence to create a genuine dispute as to whether the Settlement voided the Agreement.  In fact, the Settlement occurred long after the attempted termination, meaning that FreightHub is essentially admitting to the continuation of the Agreement until at least the 2019 Settlement.

Additionally, FreightHub claims that BGSA concealed its relationship with Cambridge Capital.  (D.E. 53 ¶ 219.)  It is undisputed that FreightHub was aware of Gordon's relationship with Cambridge Capital.  The Agreement specifically references Cambridge Capital as being associated with BGSA.  (D.E. 120-1 § C ("for as long as BGSA, *Cambridge Capital*, or Gordon remains involved with the company") (emphasis added)).   Cambridge Capital was included between BGSA and Gordon in a list of entities that would be involved in FreightHub pursuant to the Agreement.  (D.E. 120-1 § C.)  Importantly, FreightHub's Counterclaim even states that Cambridge Capital "*publicly* identifies BGSA Holdings as its affiliate on its website" and "identifies Gordon as its Managing Partner." (D.E. 53 at 14 ¶ 45) (emphasis added).  FreightHub cannot claim both that it did not know about the affiliation and that the affiliation is public knowledge.  Moreover, FreightHub made no effort to determine who Cambridge Capital was at the time of negotiating the Agreement.  Only now, almost four years later, is FreightHub arguing that it had no idea who Cambridge Capital was.  Not only is this a disingenuous argument, but it also simply does not create a genuine issue of material fact to preclude summary judgment.

As such, there is no genuine dispute of material fact that Gordon and BGSA are not investment advisers for purposes of the Investment Advisers Act of 1940 or so as to create a fiduciary duty as alleged by FreightHub.  As there can be no violation of the Act or breach of

fiduciary duty, there can also be no genuine issue of material fact that Gordon did not participate in aiding and abetting.  Therefore, no trier of fact could find for FreightHub on Counterclaims I, II, and V, and the BGSA Parties are thus entitled to summary judgment as a matter of law.

## II.     The BGSA Parties are Entitled to Summary Judgment on Counterclaim III Because FreightHub Knowingly and Voluntarily Entered Into the Agreement

FreightHub next Counterclaims for recission or reformation of the Agreement in Counterclaim III.  (D.E. 53 ¶¶ 194–205.)  Recission is a harsh remedy which a court of equity will not grant unless "it clearly appears that the claimant is entitled thereto and has not by his own conduct waived his right to the relief claimed."  *International Realty Assocs. V. McAdoo*, 87 Fla. 1, 99 So. 117, 119 (1924).  To state cause of action for rescission of contract, complaint must show: (1) character or relationship of parties; (2) making of contract; (3) existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation; (4) that party seeking rescission has rescinded contract and notified other party to contract of such rescission; (5) that party moving for rescission has returned any benefits already received from contract, if possible; and (6) that moving party has no adequate remedy at law. *Crown Ice Machine Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 617 (Fla. 2d DCA 1965).  Reformation "allows the court, not to rewrite the document, but recasts from the evidence the defective written instrument so that the instrument accurately reflects the terms of the agreement."  S*unTrust Bank v. Original Acad. of Learning, Inc.*, No. 6:15-CV-1213-ORL-DAB, 2016 WL 8914357, at *6 (M.D. Fla. June 23, 2016) (citing Florida law).

Here, FreightHub simply cannot create a genuine dispute of material fact as to element number three (3)—there is simply no existence of fraud, mutual mistake, false representations, impossibility of performance, or any other ground for rescission or cancellation.  *See Crown Ice Machine Leasing Co.*, 174 So. 2d at 617.  In fact, it is undisputed that FreightHub **(1)** took part in negotiations of the terms of the Agreement (D.E. 126-4 11:16–18; 12:6–15; 13:1–16); (D.E. 126-5 73:19–23); (D.E. 126-6 19:10–13; 20:1–5; 21:3–5); **(2)** engaged counsel to review the terms of the Agreement (D.E. 126-2 22:7–10, 14–15; 25:6–20); (D.E. 126-4 11:25; 12:1–5); (D.E. 126-6 18:21–19:3) (D.E. 126-25); (D.E. 126-26); **(3)** agreed to the terms of the Agreement (D.E. 126-4, Exh. 4 and 11:6–15); **(4)** performed under the terms of the Agreement (D.E. 126-21), and **(5)** even benefitted from the Agreement (D.E. 126-23, D.E. 126-24).  Therefore, no trier of fact could find that FreightHub is entitled to rescission of the contract.  As noted herein, the agreement is valid, legal, enforceable, and FreightHub has created no genuine issue of material fact to prove otherwise.

Moreover, because FreightHub admitted that the Agreement accurately reflected the terms of the Parties' Agreement (D.E. 126-2 31:17–32:1), no trier of fact could find that FreightHub is entitled to reformation.

Nonetheless, if the Court decides that any of these issues are true, this would only encompass a unilateral mistake on behalf of FreightHub, which does not give FreightHub the ability to rescind the contract under Florida law. *See Limehouse v. Smith*, 797 So. 2d 15, 17 (Fla. 4th DCA 2001) ("a party's performance under a contract is not excused on the basis of unilateral mistake when the mistake is the result of the party's own negligence and lack of foresight, or the other party has relied upon his performance so that rescission would be inequitable") (citations omitted); *see also Nordberg v. Green*, 638 So. 2d 91 (Fla. 3d DCA 1994) (holding that court's equitable power does not extend to reformation of a deed because of a bad business decision). In other words, FreightHub cannot simply choose to no longer honor the Agreement because it now thinks that it was a poor business decision (or found a new advisor). As FreightHub has produced no evidence to create a genuine dispute of material fact otherwise, the Agreement cannot be rescinded or reformed, and the BGSA Parties are entitled to summary judgment as a matter of law.

### III.   BGSA and BGSA Holdings are Entitled to Summary Judgment on Counterclaim IV Because FreightHub Cannot Maintain a Claim for Unjust Enrichment When There is a Valid Contract Between the Parties

Next, FreightHub counterclaims for unjust enrichment. (D.E. 53 ¶¶ 206–11.) Importantly, "the law will not imply a contract where an express contract exists concerning the same subject matter." *Kovtan v. Frederiksen*, 449 S0. 2d 1, 1 (Fla. 2d DCA 1984) (citations omitted); *see also Doral Collision Ctr., Inc. v. Daimler Tr.*, 341 So. 3d 424, 429 (Fla. 3d DCA 2022) (affirming the trial court's grant of summary judgment because it was "clear from the record that an express contract . . . exists" and therefore an unjust enrichment claim was improper). As evidenced throughout this Motion, a valid contract exists between BGSA and FreightHub on the same subject matter that FreightHub is seeking unjust enrichment. (D.E. 120-1.) Therefore, no trier of fact could find for FreightHub on a claim of unjust enrichment, and the BGSA Parties are entitled to summary judgment as a matter of law.

### IV.   The BGSA Parties are Entitled to Summary Judgment on Count VI Because the Agreement is Valid, Binding, and Enforceable

FreightHub's last Counterclaim is a declaratory action asking the Court to declare the Agreement void. (D.E. 53 ¶¶ 221–23.) For the reasons stated herein, the Agreement is valid,

binding, and enforceable. FreightHub has not produced any evidence to create a genuine dispute of material fact on this issue of validity. In fact, as it stands, the evidence is such that no trier of fact could find for FreightHub on this issue. As such, the BGSA Parties are entitled to summary judgment.

**C<small>ONCLUSION</small>**

For the foregoing reasons, the BGSA Parties' Motion for Summary Judgment should be granted. There is no genuine issue of material fact which would preclude the entry of summary judgment. The record evidence is clear that an express contract existed between the Parties and that FreightHub breached the contract when it improperly terminated and refused to perform its obligations thereunder. None of FreightHub's deficient affirmative defenses negate such facts, and FreightHub has produced no evidence to create any genuine issue of material fact. As such, no trier of fact could find for FreightHub on any of the issues presented, and the BGSA Parties are entitled to summary judgment as a matter of law.

WHEREFORE, Plaintiff and Counterclaim Defendant BG Strategic Advisors, LLC and Counterclaim Defendants BGSA Holdings, LLC and Benjamin Gordon respectfully request that this Court enter an Order granting the Motion for Summary Judgment as to the First Amended Complaint (D.E. 51) and the First Amended Counterclaim (D.E. 53) and any such further relief this Court deems just and proper.

Dated: May 12, 2023          Respectfully submitted,


ZEBERSKY PAYNE SHAW LEWENZ LLP
110 S.E. 6th Street, Suite 2900
Ft. Lauderdale, Florida 33301
Telephone: (954) 989-6333
Facsimile: (954) 989-7781

By: */s/ Zachary D. Ludens*
  JORDAN A. SHAW (FBN 111771)
  jshaw@zpllp.com
  ZACHARY D. LUDENS (FBN 111620)
  zludens@zpllp.com
  LAUREN N. PALEN (FBN 1038877)
  lpalen@zpllp.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing was filed with the Court's CM/ECF system and that all counsel of record will be served with electronic notices of the same generated by the Court's CM/ECF system.

By: *<u>Zachary D. Ludens</u>*
     Zachary D. Ludens