**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 9-21-CV-80299-DMM

_____

BG STRATEGIC ADVISORS, LLC,

                Plaintiff,

vs.

FREIGHTHUB, INC.,

                Defendant,

     and

FREIGHTHUB, INC.,

                Counterclaim Plaintiff,

vs.

BG STRATEGIC ADVISORS, LLC;
BGSA HOLDINGS, LLC; and
BENJAMIN H. GORDON,

                Counterclaim Defendants.
_____/

**<u>FREIGHTHUB, INC.'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTS ................................................................................................................................. 4

ARGUMENT ....................................................................................................................... 4

I.      FREIGHTHUB SHOULD BE GRANTED SUMMARY JUDGMENT
ON BGSA'S BREACH OF CONTRACT CLAIMS .................................................. 5

      A.     BGSA was Paid in Full ................................................................................ 5

           1.     BGSA was Paid All Success Fees .................................................. 6

           2.     BGSA was FreightHub's "Ongoing Advisor" ............................... 10

           3.     FreightHub Overpaid the Retainer ............................................... 11

           4.     BGSA was not Damaged by Non-Voting Stock ............................ 15

           5.     BGSA was Favored in ATW's Financing ...................................... 16

      B.     BGSA Did Not "Remain Involved" with FreightHub ............................. 17

      C.     The Agreement Became Terminable at Will at the End of the Term .................. 22

      D.     BGSA's Alleged Damages were Avoidable, Unforeseeable, and
Operate as a Penalty ................................................................................ 24

           1.     Recovery Is Barred as an Avoidable Consequence ...................... 24

           2.     Laches Otherwise Bars Recovery ................................................. 26

           3.     BGSA's Alleged Damages Were Unforeseeable ........................... 27

           4.     BGSA's Alleged Damages Operate as a Penalty ......................... 29

      E.     BGSA's Claim for Anticipatory Breach has no Application to this
Action ...................................................................................................... 29

      F.     BGSA and Gordon Have Unclean Hands ................................................ 30

           1.     Unclean Hands is Available as a Defense ..................................... 31

i

   2.  Unclean Hands is Shown ........................................................................31

II. **FREIGHTHUB SHOULD BE GRANTED SUMMARY JUDGMENT ON ITS COUNTERCLAIMS FOR REFORMATION AND DECLARATORY JUDGMENT** ........................................................................35

  A. FreightHub's Counterclaim for Reformation Should be Granted........................35

  B. Declaratory Judgment Should be Granted for FreightHub ...................................37

**CONCLUSION** .................................................................................................................37

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Aldon Industries, Inc. v. Don Myers & Associates*
517 F.2d 188 (5th Cir. 1975) .................................................28

*Allen v. Tyson Foods, Inc.*
121 F.3d 642 (11th Cir. 1997) .................................................4

*Alphamed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.*
432 F.Supp.2d 1319 (S.D. Fla. 2006) .................................................28

*Alvarez v. Rendon*
953 So.2d 702 (Fla. 5th DCA 2007) .................................................29

*Ayers v. Thompson*
536 So.2d 1151 (Fla. 1st DCA 1988) .................................................35

*Baker County Medical Services, Inc. v. Summit Smith LLC*
2007 WL 1229702 (M.D. Fla. 2007) .................................................5

*Barney Holland Oil Company v. Fleetcor Technologies, Inc.*
2008 WL 11407200 (N.D. Ga. 2008) .................................................12

*Beans v. Chohonis*
740 So.2d 65 (Fla. 3d DCA 1999) .................................................5

*Beefy Trail, Inc. v. Beefy Kind International, Inc.*
267 So.2d 853 (Fla. Dist. Ct. App. 1972) .................................................11

*Briggs v. Estate of Geelhoed*
543 So.2d 332 (Fla. 4th DCA 1989) .................................................26

*Bueno v. Mercado*
2017 WL 4772998 (Fla. Cir. Ct., 11th Cir., August 7, 2017) .................................................26

*Cali v. Meadowbrook Lakes View Condominium Ass'n B Inc.*
59 So.3d 363 (Fla. 4th DCA 2011) .................................................4

*Camichos v. Diana Stores Corporation*
157 Fla. 349 (Florida 1946) .................................................35

*Cassidy & Associates of Winter Haven, Inc. v. Bright House Networks, LLC*
2010 WL 11507560 (M.D. Fla. 2010) .................................................22

*City of Gainesville v. Board of Control*
81 So.2d 514 (1955) .................................................22

iii

*Congress Park Office Condos II, LLC v. First-Citizens Bank & Trust Company*
    105 So.3d 602 (Fla. 4th DCA 2013) ...................................................................30

*Connell v. Mittendorf*
    147 So.2d 169 (Fla. 2nd DCA 1962) ..................................................................31

*Corona Properties of Florida, Inc. v. Monroe County*
    485 So.2d 1314 (Fla. 3d DCA 1986) ..................................................................26

*Eccles v. Peoples Bank of Lakewood Village, California*
    333 U.S. 426 (1948) ............................................................................................31

*Emory v. Peeler*
    756 F.2d 1547 (11th Cir. 1985) .........................................................................37

*Florida-Georgia Chemical Co., Inc. v. National Laboratories, Inc.*
    153 So.2d 752 (Fla. 1st DCA 1963) ...................................................................22

*Garcia v. Rambo Security Patrol, Inc.*
    2010 WL 750296 (S.D. Fla. 2010) .....................................................................31

*Gowni v. Makar*
    940 So.2d 1226 (Fla. 5th DCA 2006) ...................................................................4

*Graphic Associates, Inc. v. Riviana Restaurant Corporation*
    461 So.2d 1011 (1984) ........................................................................................25

*Gulf Cities Gas Corp. v. Tangelo Park Service Co.*
    253 So.2d 744 (Fla. 4th DCA 1971) ...................................................................22

*Gulf Life Insurance Company v. Arnold*
    800 F.2d 1520 (11th Cir. 1987) .........................................................................31

*Hanna v. Martin*
    49 So.2d 585 (Florida 1950) ..............................................................................29

*Hardwick Properties, Inc. v. Newbern*
    711 So.2d 35 (Fla. 1st DCA 1998) .....................................................................27

*Hospital Mortgage Group v. First Prudential Development Corp.*
    411 So.2d 181 (Florida 1982) ............................................................................30

*Intercoastal Realty, Inc. v. Tracy*
    706 F.Supp.2d 1325 (S.D. Fla. 2010) ..................................................................4

*Joe Regueira, Inc. v. American Distilling Co.*
    642 F.2d 826 (5th Cir. 1981) .............................................................................22

*Lanzalotti v. Cohen*
113 So.2d 727 (Fla. 3d DCA 1959) ...................................................27

*Lazovitz v. Saxon Const., Inc.*
911 F.2d 588 (11th Cir. 1990) ........................................................11

*Lefemine v. Baron*
537 So.2d 326 (Florida 1991) .........................................................29

*Madson v. Madson*
636 So.2d 759 (Fla. 2d DCA 1994) ...................................................5

*McKesson Global Sourcing Limited v. M.C. Johnson Co.*
2022 WL 716818 (M.D. Fla. 2022) ...................................................5

*MDS (Canada) Inc. v. Rad Source Technolocies, Inc.*
720 F.3d 833 (11th Cir. 2013) ........................................................11

*McMichael v. Deutsche Bank National Trustee Company*
241 So.3d 179 (Fla. 4th DCA 2018) .................................................30

*In re Mid-America Corporation*
159 B.R. 48 (Bankr. M.D. Fla. 1993) ...............................................24

*Nello L. Teer Company v. Hollywood Golf Estates, Inc.*
324 F.2d 669 (5th Cir. 1963) .........................................................25

*New Amsterdam Casualty Co. v. Utility Battery Manufacturing Co.*
122 Fla. 718 (Florida 1936) ..........................................................28

*Offshore Marine Towing, Inc. v. Gismondi*
473 F.Supp.3d 1353 (S.D. Fla. 2020) ................................................4

*Parrish v. State Farm Florida Insurance Company*
356 So.3d 771 (Fla. 2023)..............................................................5

*Perri v. Byrd*
436 So.2d 359 (Fla. 1st DCA 1983) .................................................22

*Pittsburgh Terminal Corporation v. Baltimore and Ohio Railroad Company*
680 F.2d 933 (3d Cir. 1982)...........................................................12

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*
324 U.S. 806 (1945)......................................................................30

*Regions Bank v. Old Jupiter, LLC*
2010 WL 5148467 (S.D. Fla. 2010) .................................................30

*Rollins, Inc. v. Butland*
      951 So.2d 860 (Fla. 2d DCA 2006) ..................................................................5

*Sharick v. Se. University of the Health Sciences, Inc.*
      780 So.2d 136 (Fla. 3d DCA 2000) ................................................................24

*Sheldon v. Tieman*
      147 So.2d 167 (Fla. 2d DCA 1962) ................................................................5

*Sound City, Inc. v. Kessler*
      316 So.2d 315 (Fla. 1st DCA 1975) ..............................................................22

*Speegle Const. Co., Inc. v. District Bd. of Trustees of Northwest Florida State College*
      75 So.3d 360 (Fla. 1st DCA 2011) ................................................................4

*Stein v. Reynolds Sec., Inc.*
      667 F.2d 33 (11th Cir. 1982) ........................................................................12

*System Components Corporation v. Florida Department of Transportation*
      14 So.3d 967 (Fla. 2009)................................................................................25

*Twiss v. Kury*
      25 F.3d 1551 (11th Cir. 1994) ......................................................................4

*Yacht Club on the Intracoastal Condo Association v. Lexington Insurance Co.*
      599 F.App'x 875 (11th Cir. 2015) ................................................................31

## Statutes & Rules

Declaratory Judgment Act, 28 U.S.C. § 2201(a) ..........................................................37

Federal Rule of Civil Procedure Rule 56 ......................................................................4

Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ..........................................................32

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ........................................33

Securities Exchange Act § 15(b).....................................................................................33

17 C.F.R. § 202.5(e)................................................................................................. 34-35

Defendant and counterclaim plaintiff Freight App, Inc., f/k/a FreightHub, Inc. ("FreightHub" or the "Company"), respectfully submits this motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 against plaintiff and counterclaim defendant BG Strategic Advisors, LLC ("BGSA").

FreightHub seeks summary judgment on all of BGSA's three claims (for breach of contract, anticipatory breach of contract and declaratory judgment), and on FreightHub's third and sixth counterclaims (for reformation and declaratory judgment, respectively).

## PRELIMINARY STATEMENT

Three themes inform this contract action by FreightHub's former advisor.

First, BGSA seeks millions of dollars in "success" fees for capital raised exclusively by FreightHub that BGSA did not advise or assist on. This is not in dispute. Despite not participating in any of the transactions at issue, BGSA claims to be owed exorbitant compensation under a 2017 "advisory" agreement (the "Agreement") that BGSA has not performed under since, at latest, November 2018. BGSA comes before the Court asking for a windfall.

Second, it is undisputed that BGSA was fully paid for all of its actual work. There is no dispute that the parties collaborated from the start of their engagement in December 2017 until, at latest, November 2018, when BGSA ceased to render its services to the Company. It is also undisputed that FreightHub paid BGSA all contractual fees arising from BGSA's work during that time period:

(a)     A 10% "success fee" of $16,360 deriving from the entire $163,600 in outside capital BGSA ultimately assisted the Company in raising; and

(b)     An 8% equity "retainer" of 80,000 common stock shares deriving from FreightHub's fully-diluted capitalization of 1,000,000 shares.

In each case the math is dead simple, and BGSA acknowledged and accepted its compensation. Every additional dollar it asks for now is, once again, a windfall. Upon helping the Company raise a total of $163,600, BGSA now claims damages of $22,981,742 – more than thirteen thousand percent (13,000%) of the value of that capital.

Third, BGSA seeks to enforce a contract indefinitely. The Agreement contains no express provision for FreightHub to terminate it without cause. Therefore, BGSA argues, the engagement persists as long as BGSA unilaterally pleases, it does not have to perform any work, and it wins a

free pass to literally collect money for nothing, forever. This of course is not the law, nor the first time such an argument has been tried and failed. Where a contract of indefinite duration contains no express termination provision, it is terminable *at will* under Florida law.

In any event, the undisputed facts show BGSA ceased to remain involved in advising FreightHub *before* an express termination could have been effective. This sequence of events is significant because the Agreement provides: "In the event the Company consummates a Transaction during the term of this Engagement, then BGSA will be appointed as its ongoing advisor for the Company . . . for as long as BGSA, Cambridge Capital, or Gordon remains involved with the Company."

BGSA, Cambridge and Gordon did not "remain[] involved," and BGSA was no longer FreightHub's "ongoing advisor" by the end of the Agreement's one-year term. FreightHub had no obligation to continue the engagement beyond that express term.

Once the parties ceased working together, BGSA's conduct turned opportunistic, and then outright predatory. First, BGSA bargained aggressively with the Company to have its 8% equity retainer issued later in time than was contractually provided for, which benefitted BGSA because it avoided dilution from FreightHub's intervening capital-raising.

The Agreement called for BGSA to receive its 8% equity retainer as measured immediately following the Company's *first* capital-raising transaction in June 2018. But BGSA pushed for, and the Company acquiesced to, 8% as measured following the Company's *third* capital-raising transaction in November 2018. BGSA pushed for this precisely so that its 8% would not be diluted by raises two and three. From there, BGSA continued to push for additional dilution protection into 2019. As BGSA knows full well, by the time FreightHub issued BGSA's 8% retainer the Company was significantly overpaying.

Since BGSA also received all of its success fees, this issuance should have ended matters.

Instead, BGSA lay in wait as the Company continued growing and raising capital, without rendering any further services or asserting any ongoing rights to fees. When FreightHub announced public merger plans in October 2020, BGSA reemerged from left field and demanded not only a success fee on that transaction, but the 8% equity retainer *that it had already received, in excess of what it was owed*.

That is nothing short of predatory. By the time of the merger announcement BGSA had not only been paid in full, but overpaid; had not advised FreightHub on a transaction for two

2

years; played absolutely no role in the merger, and had never even spoken to anyone on either side of the merger.

Florida's doctrine of avoidable consequences bars a contractual party from deliberately sowing and harvesting its alleged damages. That is *exactly* what BGSA did here. BGSA complained to FreightHub late in 2018 that it believed the Company was in breach by not continuing the engagement past its term. FreightHub disagreed; BGSA filed no claims. Instead, it badgered its way to a significantly more generous retainer while repeatedly raising the prospect of legal action. Fully paid, BGSA then deliberately waited incommunicado to see if the Company would achieve a major change of control transaction. When it did, BGSA reappeared claiming to be its "advisor." This is profiteering at its ugliest, and is barred under basic contractual and equitable doctrines discussed below.

BGSA's entire course of dealing with FreightHub was marked by unclean hands. Gordon was under SEC investigation for securities law violations for nearly a full year before the FreightHub engagement began. ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ FreightHub was never informed of anything. When BGSA helped raise only $163,600 of a failed $5,000,000 equity round, the Company was forced to return to its existing investors for not one, but two, bridge infusions of capital.

In June 2019 Gordon entered into a consent order with the SEC that barred him from the securities industry for a year based on willful violations of the Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act"). Yet again, FreightHub had no idea.

Before the ink on his SEC consent order could dry, Gordon then promptly violated it by negotiating for more BGSA compensation while he was explicitly prohibited from associating with BGSA under the terms of the order. This is established by irrefutable, timestamped email exchanges. When the Company finally learned of Gordon's suspension well after the fact and asked Gordon about it, Gordon downplayed, dissembled and misled the Company about its true nature. Unclean hands exists for these circumstances.

For these and all of the other reasons below FreightHub should be granted summary judgment on BGSA's entire repugnant action.

## FACTS

The Court is respectfully referred to FreightHub's accompanying Statement of Material Facts ("SOF") for a summary and timeline of events, familiarity with which is assumed below. Abbreviations not defined below are as defined in the SOF.

As will become evident, the material facts are not in dispute in this case, only the parties' legal interpretation of the Agreement. In particular, several key sequences are extensively documented in email exchanges, and warrant reading in full. For all of these reasons, the case is plainly ripe for summary judgment.

## ARGUMENT

### *Standard on Summary Judgment*

Federal Rule of Civil Procedure ("FRCP") Rule 56(a) provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Twiss v. Kury*, 25 F.3d 1551, 1554 (11th Cir. 1994). An issue of fact is "material" if it is a legal element of the claim which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the nonmoving party. *Id*.

### *Principles of Contract Interpretation*

The Court is called on here to examine the parties' written Agreement, which is governed by Florida law. Dx. 9 at 3, § K. Black-letter principles of contract interpretation guide this analysis.

Under Florida law, the intention of the parties to a contract must be determined from examination of the whole contract, not just from its separate phrases or paragraphs. *Offshore Marine Towing, Inc. v. Gismondi*, 473 F.Supp.3d 1353 (S.D. Fla. 2020); *Cali v. Meadowbrook Lakes View Condominium Ass'n B Inc.*, 59 So.3d 363 (Fla. 4th DCA 2011). A court must read the various provisions harmoniously, in order to give effect to the whole contract. *Speegle Const. Co., Inc. v. District Bd. of Trustees of Northwest Florida State College*, 75 So.3d 360 (Fla. 1st DCA 2011). All of its parts must be compared, used and construed with reference to each other. *Gowni v. Makar*, 940 So.2d 1226 (Fla. 5th DCA 2006). An interpretation that gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation that leaves a part unreasonable, unlawful or without effect. *Intercoastal Realty, Inc. v. Tracy*, 706 F.Supp.2d 1325

4

(S.D. Fla. 2010).

Contract terms are to be construed in accordance with their plain and ordinary meaning, unless intended to receive a special meaning. *Madson v. Madson*, 636 So.2d 759, 761 (Fla. 2d DCA 1994). A term's "plain and ordinary meaning" is the natural meaning that is most commonly understood in relation to the subject matter. *Sheldon v. Tieman*, 147 So.2d 167, 169 (Fla. 2d DCA 1962). The plain and ordinary meaning of a term is also frequently its dictionary definition. *Beans v. Chohonis*, 740 So.2d 65, 67 (Fla. 3d DCA 1999); *see also Parrish v. State Farm Florida Insurance Company*, 356 So.3d 771, at 776 (Fla. 2023) ("[d]ictionaries aid us in establishing the publicly understood plain meaning of a word whose relevant definition is contested").

## I.     FREIGHTHUB SHOULD BE GRANTED SUMMARY JUDGMENT ON BGSA'S BREACH OF CONTRACT CLAIMS

To prevail on its claim for breach of contract, it is BGSA's burden to show the existence of a contract, a material breach, and resulting damages. *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2d DCA 2006). Contracts are ordinarily complete upon each party's fulfillment of its duties. *Baker County Medical Services, Inc. v. Summit Smith LLC*, 2007 WL 1229702, at * 3 (M.D. Fla. 2007); *McKesson Global Sourcing Limited v. M.C. Johnson Co.*, 2022 WL 716818, at *5 (M.D. Fla. 2022). "[A] duty is discharged when it is fully performed." *Id.* (*quoting* Restatement (Second) of Contracts, § 235, Cmt. a.).

Here, BGSA cannot prevail on its breach of contract claim for several reasons, each of which is fatal to the claim. First, the discussion below shows there is no dispute of fact that BGSA was fully paid under the Agreement and has suffered no damages. Second, BGSA ceased to remain involved with FreightHub through the end of the term, and as such, there was no obligation under the Agreement to continue the relationship. Third, the Agreement became terminable at will at the end of its term, FreightHub validly terminated upon reasonable advance notice. Fourth, equitable doctrines bar BGSA's efforts to abuse the contract to gather a windfall.

On top of all this, BGSA completely fails to demonstrate its own continuing performance under the Agreement, which it claims remains in effect through the present day. Without the ability to prove its own ongoing performance, BGSA cannot show FreightHub remains in ongoing breach.

### A.     BGSA Was Paid in Full

Here, BGSA cannot show either a material breach of the Agreement or any damages

because FreightHub has paid in full for its services. As shown below in granular detail, BGSA was paid all compensation owed to it, including all compensation earned from BGSA's actual work and all compensation arising under the terms of the Agreement. As FreightHub has fully performed, its contractual duties are discharged.[1]

        **1.**        **BGSA was Paid All Success Fees**

        *BGSA was Fully Paid for its "Efforts"*

The Agreement entitles BGSA to 10% success fees on "Transactions," excluding any of BGSA's own investment (of which there was none) or "any funds raised from any existing investor[.]" Dx. 9 at 2, § A.1-2.

"Transactions," in turn, are defined in terms of BGSA "efforts." The Agreement defines a "Transaction" as follows, Dx. 9 at 1 (*emphases added*):

> The parties agree that BGSA shall proceed with *its efforts* to find a Transaction or multiple Transactions acceptable to the Company and its shareholders. *Said opportunity* may involve a capital raise, strategic investment, sale, merger, combination, reorganization, recapitalization or other business transaction with the Company, in which the Company sells, transfers or exchanges any or all of its assets, liabilities, or stock in any transaction whether for cash, securities or other consideration, as a single transaction or series of transactions, except as done in the ordinary course of business (collectively, a "Transaction").

The Agreement's so-called "tail" provision further indicates that a "Transaction" involves BGSA's "efforts." It states: "If no Transaction has occurred during the Term of this Agreement, and if during the twelve (12) months following the expiration or termination of this Agreement, the Company consummates a Transaction, *with or without the continued assistance of BGSA*, then BGSA shall be entitled to receive the Success Fees above." Dx. 9 at 2, § B (*emphasis added*). In other words, a "Transaction" during the term necessarily requires BGSA's "efforts," but a "Transaction" during the one-year "tail" period after the term may occur "with or without the continued assistance of BGSA." *Id.*

It is undisputed that during the term, BGSA utilized its "efforts" on only two deals:

---

[1] This is FreightHub's first affirmative defense. *See* Defendant's Answer ("Answer"), Affirmative Defenses and First Amended Counterclaims ("Counterclaims") to Plaintiff's First Amended Complaint. ECF 53 at 4 ¶ 1.

1.      The First Bridge, an aggregate $1,000,000 bridge round of eleven convertible debt notes issued to nine investors over staggered dates ending in June 2018. SOF ¶¶ 51-57; and

2.      The Second Bridge, an aggregate $300,000 bridge round of seven convertible debt notes issued to three investors over staggered dates ending in October 2018. SOF ¶¶ 58-68.

It is also undisputed that BGSA introduced FreightHub to only two of the participants in these deals, Delmar and Krifcher. Together, Delmar and Krifcher invested a total of $163,600 ($113,600[2] and $50,000, respectively) of the $1,300,000 raised by the Company on the two bridge rounds. It is undisputed that BGSA's introductions resulted in no other investment. Every other investor in the First Bridge and Second Bridge was an "existing investor" in the Company, and excluded from success fees. SOF ¶¶ 55-57.

FreightHub's third capital-raising round following the engagement was its November 2018 senior secured loan agreement with ATW (the "ATW Financing"). SOF ¶¶ 96-100; 122-133. By its own admission, BGSA had no involvement in this financing. SOF ¶ 132. As analyzed in detail below, by mid-November 2018 the parties were no longer working together. *See infra* Section I.B. Indeed, days after the parties signed their non-binding preliminary term sheet for the ATW Financing in September 2018, Gordon emailed: "What's happening on the deal front?" and "What's the business update? I haven't seen any numbers in several months." Dx. 33 at 1.

There is no evidence and no argument that BGSA utilized any "efforts" to qualify any capital raising after the First and Second Bridge as a "Transaction." As no other deals involved BGSA's efforts and no other BGSA introductions resulted in any investment, the success fees are fully paid.

*No Breach Occurred in Paying the Success Fees*

BGSA invoiced FreightHub for its 10% success fee of $16,360 on December 13, 2018. Dx. 49. FreightHub paid in full, as evidenced by electronic transfer records. Dxs. 50; 55. BGSA marked the invoice "PAID 12/26/2018." Dx. 55 at 9.

The Agreement called for success fees to be paid in a combination of cash (7%) and equity (3%). Dx. 9 at 2, § A.1. On December 12, 2018, BGSA agreed to accept its entire $16,360

---

[2] Delmar invested $100,000 under the First Bridge in February 2018 and the remaining $13,600 under the November 2018 ATW financing. Dx. 44 at 14; Dx. 52 at 2.

success fee in cash, with Gordon confirming: "The numbers are relatively small, so we can keep it simple. I think doing the 3% in cash is fine." Dx. 52 at 2.

The Agreement provides: "A Transaction shall be deemed consummated as of the date on which the Company delivers signed closing documents effecting a Transaction (the 'Closing'). The Success Fees shall be due immediately at the Closing." Dx. 9 at 2, § A.3.

BGSA contended at the time that its success fees were late, as the First Bridge ended in June 2018 and the Company delivered the fees in December 2018. Gordon wrote the Company in November 2018 that if "'Transactions' have already happened, then the company is in default of [the] agreement, since as you know, investors I brought to the company [. . .] already wrote checks (e.g. Delmar), but I still haven't been paid." Dx. 48 at 4.

This is of no consequence today as the fees are all long paid. But Gordon also misunderstood the Agreement; the fees were never late to begin with. That is because a "Transaction" is defined to include capital raises undertaken both "as a single transaction" as well as a "series of transactions." Dx. 9 at 1. The First Bridge and Second Bridge were each the latter – a "series of transactions" consisting of multiple convertible notes issued under separate purchase agreements. Note purchases were staggered over time until the Company reached aggregate investment totals of $1,000,000 and $300,000, respectively. *See* Dx. 42 at 45-47; Dx. 44 at 1, 14; Dx. 45 at 1, 8. For these reasons, neither the First Bridge nor the Second Bridge had a "Closing" – a date defined under the Agreement as the "date on which the Company deliver[ed] signed closing documents." Since neither Transaction had a "Closing" under the Agreement, fees were not and could not be due "immediately at the Closing." *Id*.

As shown below, Gordon invoked the language of "breach" and "default" on the success fees against the Company to help bully it into overpaying its retainer. But the success fees were never untimely.[3]

*Every Other Investor During the Term was an "Existing Investor"*

The Agreement excludes from success fees "any funds received from any existing investor of the Company." Dx. 9 at 2, § A.2. Other than Delmar and Krifcher, every other

---

[3] In any event, any purported breach arising from the Company's timing of success fee payments was not a material breach, and any non-payment was cured prior to suit, resulting in no damages.

FreightHub investor from the start of the engagement on December 11, 2017 through the end of its term on December 11, 2018 was an "existing investor of the Company."[4]

In two cases, the investments during the term were by entity affiliates of existing investors from before the term. Pishinano Investment Holdings, Ltd. ("Pishinano"), a FreightHub investor from January and June 2018, is the investment vehicle of Yuri Kokush, a natural person and existing investor from September 2017. Dx. 43 at 9, 16; Dx. 44 at 14. Similarly, ATW Master Fund II, L.P., the lead investor in the Company's November 2018 financing, is an affiliate of ATW Fund I, L.P., an existing investor in the Company since March 2017. Both are affiliates of ATW Partners, LLC. *See* Dxs. 17 (Fund I); 42 (Fund II); SOF ¶¶ 91-92. Kerry Propper, a Managing Partner and affiliate of ATW's family of entities, also invested individually in FreightHub during the term. Dx. 45 at 8.[5]

BGSA claims these affiliates of existing investors are not themselves "existing investors," and BGSA should be paid success fees for them. This is just another grift for BGSA to extract unearned fees without the "efforts" required to qualify capital-raising as a "Transaction." To be sure, BGSA never claimed success fees for any of these affiliates of existing investors at the time of the Agreement, or in any dialogue with the Company over disputed fees. BGSA further admits it did not introduce FreightHub to any ATW affiliates, SOF ¶¶ 60-61, and attempts no showing of having introduced Pishinano.

As "existing investors" is not defined by the Agreement, the intent of the phrase must be determined from examination of the whole contract, not just provisions in isolation, and the provisions read harmoniously to give effect to the whole. *See supra* p. 4 (*citing cases*).

Here it is abundantly clear the Agreement is concerned with new introductions, and compensates BGSA by success fees for new introductions. The Agreement provides BGSA will "work with the Company's management to . . . identify prospective investors[.]" Dx. 9 at 1. Section A.1 of the Agreement ties vesting of the retainer to the Company "receiving introductions" to at least ten executives of "strategic companies" and "receiving one

---

[4] This is established by comparing the Company's investors from its 2015 founding through December 11, 2017, *see* Dxs. 35 at 13; 43 at 16 (listing existing investors) with the Company's investors during the term of the Agreement, *see* Dxs. 44 at 14; 45 at 8; 47 at 70-73.

[5] There were similar instances of this well after the term. JADI Trust, an irrevocable trust of "existing investor" Andrew Intrater, received certain of Intrater's convertible debt in December 2020. Additional ATW affiliates ATW Opportunities Master Fund, L.P. and ATW Partners Opportunities Management, LLC also invested after the term. Dx. 84 at 12-15.

introduction" to a "strategic client." Dx. 9 at 2. Annex B provides a non-exhaustive list of these "strategic companies" and "strategic clients." Dx. 9 at 6-8. The fees, in turn, depend on BGSA's "efforts." Dx. 9 at 1. Nothing in the Agreement contemplates BGSA being paid passive success fees for investors already affiliated with the Company, whom BGSA did not introduce.

*BGSA Did Not Earn Success Fees During the "Tail"*

The Agreement provides: "If no Transaction has occurred during the Term of this Agreement, and if during the twelve (12) months following the expiration or termination of this Agreement, the Company consummates a Transaction, with or without the continued assistance of BGSA, then BGSA shall be entitled to receive the Success Fees above." Dx. 9 at 2, § B.

The provision above states that *no* success fees will arise during the tail if a Transaction occurred during the Term. Since it is undisputed that a Transaction did occur during the term, BGSA is not entitled to success fees during the tail period. In any event, BGSA earned no success fees in the tail period, as it worked on no Transactions and introduced no investors from December 11, 2018 through December 11, 2019.

## 2.     BGSA was FreightHub's "Ongoing Advisor"

The Agreement states that "[i]n the event the Company consummates a Transaction during the Term of this Engagement, then BGSA will be appointed as its ongoing advisor[.]" Dx. 9 at 2, § C.[6] BGSA alleges the Company breached in failing to appoint BGSA as its "ongoing advisor."

But this ignores a basic fact: BGSA *did* remain FreightHub's ongoing advisor after it consummated its first Transaction. On this the record is clear. The First Bridge concluded in June 2018. BGSA then continued advising the Company into the Second Bridge, which ran from June through October of 2018. SOF ¶¶ 58-68.

As there is no dispute that a Transaction occurred during the term, and there is no dispute that BGSA remained the Company's advisor after that Transaction, the dispute over this provision reduces to the single question of whether BGSA was properly "appointed."

In other words, BGSA contends that merely *remaining* FreightHub's advisor was not enough. Greater ceremony was called for: BGSA needed to be "appointed." This is hair-splitting. The difference between BGSA remaining FreightHub's ongoing advisor after the First Bridge

---

[6] This is for so long as BGSA, Cambridge or Gordon "remains involved," a topic addressed at length below.

and being "appointed" FreightHub's ongoing advisor after the First Bridge is inconsequential, if there is any difference at all.

The doctrines of material breach and substantial performance both demonstrate this. "To constitute a vital or material breach, a party's nonperformance must 'go the essence of the contract.' A party's 'failure to perform some minor part of his contractual duty cannot be classified as a material or vital breach.'" *MDS (Canada) Inc. v. Rad Source Technolocies, Inc.*, 720 F.3d 833, 849 (11th Cir. 2013) (*quoting Beefy Trail, Inc. v. Beefy Kind International, Inc.*, 267 So.2d 853, 857 (Fla. Dist. Ct. App. 1972)).

Substantial performance, in turn, is performance "nearly equivalent to what is bargained for" and "is applicable where a variance from the specifications of the contract is inadvertent or unintentional and unimportant." *Lazovitz v. Saxon Const., Inc.*, 911 F.2d 588, 592 (11th Cir. 1990) (*internal citations omitted*).

Here FreightHub substantially performed under the Agreement by continuing to be advised by BGSA following the First Bridge, and any distinction between that and "appointment" is not material.

### 3. FreightHub Overpaid the Retainer

#### *The Retainer was not Dilution-Protected*

The Agreement provides: "BGSA's principal, Benjamin Gordon and/or his designees, will receive stock equal to 8% of the fully-diluted equity of the Company's stock, based on the total capitalization as of the date of the closing of the next Transaction." Dx. 9 at 2, § A.2.

The First Bridge was the "next Transaction" after the engagement, and 8% of the Company's fully-diluted equity was owed upon its completion in June 2018.[7] SOF ¶¶ 51-57.

Gordon's designee BGSA Holdings LLC ("BGSAH") received the equity in January 2020, well over a year later. The cause of the delay was simple: Gordon bargained relentlessly to have the issuance pushed back as much as possible, in order to avoid dilution. The Company, as an accommodation, agreed to delay the issuance until conversion of its convertible debt to equity.

The Agreement did not protect BGSA's retainer from dilution. It states that BGSA would

---

[7] FreightHub does not dispute that the entire 8% vested per the terms of the Agreement. Fifty percent vested upon completing the First Bridge and the other 50% vested upon the Company receiving sufficient industry introductions.

receive "8% of the fully-diluted equity" of the Company as of the next Transaction, not 8% in dilution-protected or non-dilutable equity.

There is no dispute on this. Gordon concedes in deposition testimony that the retainer was not dilution protected. Dx. 3 ("BG") 62:23-63:24. Federal courts have also repeatedly refused to add anti-dilution protections into an investment instrument that fails to express them. In *Broad v. Rockwell International Corporation*, the Fifth Circuit considered the question closely in the context of debenture agreements comparable in respects to FreightHub's convertible notes. 642 F.2d 929 (5th Cir. 1981).[8] After considering relevant authorities dating back as far as 1899, the court determined that there were no anti-dilution protections at common law and that no such protection was afforded unless expressly included in the instrument. *Id*. at 943-946. *See also Pittsburgh Terminal Corporation v. Baltimore and Ohio Railroad Company*, 680 F.2d 933, 952 (3d Cir. 1982) (risk of dilution was inherent in debenture instrument that expressed no dilution protection); *Barney Holland Oil Company v. Fleetcor Technologies, Inc.*, 2008 WL 11407200, at *14 (N.D. Ga. 2008) (court could not infer anti-dilution protection into warrant instrument that expressed none).

*Gordon Fought to Delay and Enlarge the Retainer*

As the retainer was not dilution-protected, Gordon's fought to have it issued later in time to increase its value. Gonzalez and Gordon debated this for over a year. Their emails make clear there is no dispute of fact that BGSA aimed to extract more from the retainer than was set forth in the Agreement.

The ATW Financing neared closing in November 2018. The agreement contemplated a $4,000,000 lending facility payable in three tranches. Tranche A ($850,000) was to be delivered upon closing. Tranches B and C were contingent upon Company performance targets and other conditions. SOF ¶¶ 97-98; 122-133. The debt was convertible to preferred shares, and upon conversion would dilute common stockholders.

On November 8-9, a week prior to the closing, the Company prepared to issue the retainer. Gonzalez notified Gordon that "two 'Transactions,' as defined in the agreement, have happened." The Company prepared to issue the retainer "on a fully diluted, as-converted basis," including both of those two Transactions. Dx. 51 at 4.

---

[8] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

Gordon wrote back and requested "to have the 8% account for the next Transaction," namely, the ATW Financing, so as to avoid dilution. Gordon wrote: "Can we please agree to that, so we can move on?" *Id*. Gonzalez explained that per the Agreement, the retainer "should be 8% on $5.66m (all the past money until right now) and you're saying 8% on ($9.66m)," including all of ATW's potential $4,000,000 financing. Dx. 51 at 2.

The ATW Financing closed on or about November 16. Dx. 47. Gonzalez wrote on November 28 that they were "still struggling . . . not on the 8%, but on '8% as of when' (as of the $1m transaction we closed in the Spring or as of this one)." Dx. 51 at 1.

Gordon responded on December 21, 2018: "For the equity – do you want to just have it convert into 8% in the next round where there is an actual pricing? That was the original intent and certainly the simplest." Gonzalez replied: "I think the award should happen simultaneously with the conversion of all the notes into shares, yes." Gordon wrote: "Okay. So why don't we just have a simple letter that clarifies that." *Id*.

On February 15, 2019 Gordon sent a proposed draft of this letter. Dx. 53 at 2. Gonzalez reviewed and responded: "you added a 12 month tail on this to capture the next, next transaction, which is not in the cards . . . any agreement signed here has to be final." Dx. 53 at 1. Gonzalez proposed issuing up to 80,000 shares (8% of the Company's fully-diluted equity of 1,000,000 shares), beginning first with the portion representing the currently issued common stock shares and options, and the remainder as and when the convertible notes converted. Gonzalez concluded: "With respect to shares, that's it. There is no anti-dilution where the Transaction keeps moving forward. I will remind you that there were other note rounds (other Transactions) before this November deal. We moved the goal line already in sprit [sic] of wanting to move forward." *Id*.

Gordon responded on February 15: "Fine. Let's just move on." *Id*.

FreightHub's then-counsel sent a revised draft letter to Gordon on February 26. Dx. 55 at 3. Gordon returned a further revision on March 5, 2019. It included a new edit that BGSA "shall continue to own not less than eight (8%) percent of the fully-diluted share capital of the Company." Dx. 56 at 1. In other words, Gordon was now trying to dilution-protect the retainer (contrary to the Agreement) *in addition to* having the retainer issued following the Company's "next, next, next" capital raise (contrary to the Agreement).

Gonzalez emailed on March 22, 2019:

13

Following your initial involvement which resulted in investors investing $163,600 in the Company, neither you nor BGSA or Cambridge Capital have remained involved with the Company and no additional amounts were invested in the Company as a result of your involvement. Other than the initial few introductions to executives and your role in bringing a small investment, you have played no advisory role with the Company, and you have had no involvement with the Company since November 2018. The Company appreciates your early contributions. However, as of November 2018, you have had no involvement with the Company and the Company therefore no longer considers you as an advisor to the Company. The Company will issue you the 8% equity on a fully diluted basis . . . Following that, the Company considers the agreement to have terminated since you ceased providing any services in November 2018. Dx. 60.

Gonzalez emailed Gordon again on June 3, 2019:

In Spring 2018, the company raised $1m. This was a convertible note financing, and Del Mar and Danny participated. You have been paid in cash for those introductions. Per our agreement the company could treat this as a Transaction. This would mean that you'd have approximately 80,000 original common shares (like mine). Fast forward to November 2018, when the fundraising did not work out, the ATW-led financing did a recap and crammed the original common down. BGSA would have had ~8,000 out of a 1M post-recap shares not 80,000. We have not done this . . . What we're offering you is 80,000 of these 1.00M shares, 8% of the company, post Series A. We interpreted your proposal as wanting anti-dilution all the way to some future Series B, which was never in the cards. Dx. 80 at 4.

On June 13, 2019, Gordon next requested 80,000 shares of the "same class as that of the investors," *e.g.*, preferred stock rather than common stock. Gonzalez responded that that is "like having essentially a note," and was "never discussed or outlined." Dx. 70 at 3.

Dialogue resumed in October. Gonzalez explained that "[w]e were at the 1 yard line, but then you requested something that was never contemplated . . . We got stuck as you were requesting essentially notes, which my investors bought in cash." Dx. 70 at 3.

Gonzalez clarified the Company's position twice more. On October 21, 2019 he wrote: "To be clear here's our offer: 8% on a fully diluted basis (includes conversion of notes into

14

Series A and options) in common stock." Dx. 70 at 3. On October 25, 2019 he repeated: "Solely for the purpose of trying to settle this matter amicably and immediately, we would consider offering common shares representing 8% of the fully diluted share capital (including all notes, as-if converted) <u>not at the Spring 2018</u> round but jumping forward to November 2018 which effectively gives you more equity (note that this is still the capitalization today)." *Id*. (*underlined in original*).

On December 31, 2019, FreightHub issued a certificate for 80,000 shares of common stock to BGSAH and delivered it to BGSA on January 22, 2020. Dxs. 71; 72; 73. BGSAH's shares constituted 8% of FreightHub, based on its fully-diluted capitalization of 1,000,000 shares. The Company's capitalization table from several months later in May 2020 shows that "BGSA/Cambridge Capital" continued to own 80,000 shares, constituting 8% of the fully-diluted equity of the Company. Dx. 76.

BGSA's own damages expert agreed, writing:

Based on the May 2020 cap table, the 80,000 shares issued to BGSA represented 8% of the fully-diluted equity giving consideration to issued and outstanding common stock (after a reverse stock split), warrants then in effect, employee stock options, and the convertible debt raised in the Initial Note, Second Note, First Bridge and Second Bridge financing. The fully-diluted number of shares as converted was approximately 1 million shares. Dx. 93 at 13-14.

Unbelievably, the Company's overpayment still did not end the matter. Almost eight months after receiving the retainer, Gordon emailed Gonzalez again on October 16, 2020 following announcement of the Hudson merger plans. Gordon wrote: "I see Fr8Hub completed a transaction with Hudson Capital. Congratulations. Can you please send me the transaction documents and cap table, so we can calculate what 8% of the total equity capitalization is, and finalize this?" Dx. 70 at 1.

To summarize: BGSA now seeks damages for the difference between its current percentage ownership and 8%, *in addition to* the 8% it already received, which repeatedly skipped dilution of the 8% BGSA would have received if it had been properly measured and issued on the basis of the First Bridge.

### 4.    BGSA Was Not Damaged by Non-Voting Stock

BGSA alleges it was damaged by receiving its retainer in Non-Voting Common Stock,

which it refers to as "a lower class" of equity. This argument fails on several fronts.

First, the Agreement provides that BGSA or Gordon's designee will receive its retainer in "stock." It does not specify a particular class of stock. As seen in the preceding section, the class of stock Gordon ultimately sought to obtain, preferred stock, did not exist at the time of the Agreement and BGSA had no valid claim to it. Preferred stock was available to investors who made cash purchases of company debt, upon conversion of that debt.

Second, the Company's First Amended and Restated Certificate of Incorporation adopted at the time of ATW's Financing spelled out the rights and preferences of the Company's new Non-Voting Common Stock class. The Certificate makes no economic distinction between Voting and Non-Voting Common Stock. See Dx. 42 at 10, §§ A-B.

Third – and this is critical – Voting and Non-Voting Common Stock received *identical consideration* under the December 21, 2021 Merger Agreement between FreightHub and Hudson Capital ("Hudson"). The merger was structured as a share exchange under which Voting and Non-Voting Common Stock received the identical right to receive ordinary shares of Hudson at a fixed exchange ratio of 1:126855. No distinction was made for Non-Voting Common Stock. *Compare* Dx. 86 at 52 § 1.15 ("Company Common Stock" definition under Merger Agreement) *with* Dx. 86 at 64 § 4.5 ("Company Non-Voting Common Stock" definition).

When the merger was consummated on February 14, 2022, all voting and non-voting common stock holders received Hudson ordinary shares under the same exchange ratio, including BGSAH. Dx. 89. This is shown under Merger Agreement Schedule 1.38, which sets forth the exchange ratio and share exchange amounts received by the stockholders including BGSAH. BGSAH was not prejudiced. Dx. 85.

As BGSAH ultimately obtained merger consideration equal in value and standing to every FreightHub voting common stock holder, it suffered no damages from non-voting stock.

### 5.      BGSA Was Favored in ATW's Financing

BGSA alleges it was prejudiced in the ATW Financing by receiving Non-Voting Common stock. In fact, BGSA was favored in the financing because the Company did not issue the stock in order to protect it from dilution. BGSA received the full benefit of its bargain.

In anticipation of closing, the Company authorized but did not issue BGSA's 80,000 share grant. Its 80,000 number was calculated on the basis of a one million share fully diluted equity capitalization. But the financing also enacted an eight-to-one reverse stock split reducing

the number of Common Stock shares issued and outstanding. Each 12.276515 shares of Common Stock were reverse-split into 1 share at closing.

If BGSA's Non-Voting Common Stock had been issued at closing, it would have immediately been reduced eight-to-one from 80,000 shares to 6,517 shares, as rounded to the nearest share. By not being issued, BGSA avoided its grant being immediately reduced, or as the parties referred to it, "crammed down." Dxs. 53 at 1; 80 at 1.

The record further shows that creating a new class of non-voting stock had a benign purpose: because the Company's old and new debt was not converting to equity upon closing, issuing BGSA its 80,000 shares at the time would have yielded BGSA a percentage interest *far greater* than 8%. Not only would this run contrary to the parties' Agreement, it would have been a greater percentage ownership than any other common stock holder at the time, placing BGSA in voting control of the Company.

The Company's closing date cap table demonstrates this. It shows that if 80,000 shares of common stock had been issued to BGSA on a fully-diluted basis, BGSA would have held a 23.54% equity interest, and voting control. Dx. 47 at 79.

Gonzalez explained this to Gordon by email at the time, writing that "awarding shares now would make you the vast majority shareholder!" Dx. 51 at 1. Gonzalez testified that that "was not ever the intention here . . . there was no commitment to have, you know, this entity that we're now trying to negotiate with but have not found a resolution for months to essentially block a transaction. As you know, often you do need shareholder approval to do this. There's no scenario that we could be held hostage in just the normal course of raising money." EG 164:20-165:5.

Gonzalez further summarized the matter in deposition. If BGSA was issued voting stock at closing it "would have been a voting member," but due to the reverse split it would be "voting with a, let's say point eight percent of the company, not eight percent of the company. That's – that's what is missing here. The reality is, the number[s] actually don't lie, right? So he [Gordon] would have been completely crammed down if we would have said the spring, 2018 is the transaction, meaning the next transaction for this. We didn't do that[.]" EG 194:14-24. Every other common stock holder including Gonzalez was "crammed down," but BGSA was spared.

### B.    BGSA did not "Remain Involved" with FreightHub

The Agreement provides:

In the event the Company consummates a Transaction during the term of this Engagement, then BGSA will be appointed as its ongoing advisor for the Company, on the same terms as in this letter including paragraphs A and B unless otherwise mutually agreed, for as long as BGSA, Cambridge Capital, or Gordon *remains involved* with the Company. Dx. 9 at 2, § C (*emphasis added*).

The parties dispute whether, and when, BGSA, Cambridge Capital or Gordon "remain[ed] involved." "Involved" is not defined by the Agreement.

As discussed earlier, such terms are to be construed in accordance with their plain and ordinary meaning unless intended to have a special meaning. A "plain and ordinary meaning" is the natural meaning that is most commonly understood in relation to the subject matter, and is often a term's dictionary meaning. *See supra* p. 5 (*citing cases*).

Here the pivotal term "involved" or "involve" includes the following dictionary definitions (emphases in original): "Bring (a person) into a matter; embroil (a person) *in* trouble, difficulties, perplexity, etc." "Commit emotionally; concern closely *with* another, *in* a matter." "Include, contain, comprehend." "Contain implicitly, include as essential; imply, call for, entail." "Affect, concern directly." "Absorb completely, envelop, overwhelm." *Involve*, The New Shorter Oxford English Dictionary (1993). "Concerned, caring, committed." *Id*. at *Involved*.

The record shows BGSA, Cambridge and Gordon ceased to be "involved" with FreightHub before the one-year term of the Agreement ended on December 11, 2018. Although BGSA was the Company's "ongoing advisor" following the First Bridge in June 2018, it was no longer an "ongoing advisor" five months later in November 2018 as it had ceased to "remain[] involved."

Indeed, the record shows November 2018 is merely *the very outside date* of BGSA's ostensible "involvement." The relationship had tapered off drastically since June and was negligible by late August. The record shows the following chronological sequence:

In June 2018, the Company began seeking its Second Bridge from existing investors as a Series A stock round led by BGSA and Cambridge flopped. Gordon, Axelrod and Gonzalez emailed about the need to sell the Company or shut down operations if more capital could not be raised in a matter of weeks. SOF ¶¶ 58-68; Dxs. 28 at 1-2; 30 at 1-2.

### *Fading Away*

Axelrod testified that the relationship faded away beginning around this point. He recalled that it "kind of faded away. I don't think it was a kind of a choice from either Ben

18

Gordon or us. It was, I think, lack of interest on both sides." He recalls: "I think since June or July we didn't have almost any connection with Ben[.]" He recalls BGSA being involved "[f]rom the beginning of '18 though somewhere mid 2018, July, August '18." And "I don't recall anything in August or September . . . I don't think we have engagements with [BGSA] at that time." OA 27:8-10; 55:24-25; 89:11-14; 96:25-97:2; 58:16-18; 111:16-18.

### NFI

Gonzalez testified that the end point of the parties' relationship was the Company's late-stage efforts to reach a deal with industry player NFI to rescue FreightHub through either investment or acquisition.

On July 27, 2018, FreightHub and NFI arranged for NFI's executive team to fly to Laredo, Texas to conduct due diligence and hold negotiations. The NFI meetings took place on or about August 6-7, 2018. BGSA did not attend or participate.[9] When NFI declined to do a deal, Gonzalez testifies that "after that NFI meeting the process, the formal process [with BGSA] was finished." Gonzalez explained: "if there is no other investors around, you know, this process that began in January or February with prep even before then, you know, at some point you have to call it. If there is no date, if there is not a line in the sand, but if you're looking around and there is no one there, okay, this is over."

He further stated: "[I]f there's no active process being led by the banker, whether that is a month, more than that, that would be no involvement, meaning there is no process. These things don't exist in a vacuum. You have to work the process . . . There is no process, so there is no involvement."

The email record supports this unequivocally. BGSA's *only* emails to FreightHub in August 2018 concerned NFI's Laredo visit. From September through November 2018, inclusive, BGSA sent only a few scattered emails (other than Gordon trying to sweeten his retainer).

### September – November

Gordon sent a few sporadic emails about investors, customers or partners between September and November 2018:[10]

---

[9] Gordon was served with a Wells Notice by the SEC while FreightHub was meeting with NFI, and filed his Wells Submission on August 14 in an unsuccessful bid to stave off the securities charges against him.

[10] Gordon also emailed on the separate topic of BGSA's compensation.

- **September**: On September 21, 2018 Gordon emailed the Company about a potential investor, Convoy. Gordon asked Convoy if it would reconsider an earlier decision it made not to invest in June. Dx. 33 at 3. It did not.

- **October**: On October 8, Gordon emailed the Company about an individual who could be a "potential customer and partner," but not investor. Dx. 36. On October 11, Gordon emailed the Company about another company, Mexpress, flagging it as a potential partner but not investor. Dxs. 37; 38.

- **November**: On November 7, Gordon emailed that he planned to speak to a company named Transplace. There was no follow-up. Dx. 40 at 1. On November 8, Gordon emailed a one-sentence message: "FYI, I had a good discussion with Kerry Miller, and said nice things about you guys." Dx. 66. Kerry Miller was a mutual acquaintance of both FreightHub and Gordon and an existing investor in FreightHub from before BGSA's engagement. Dx. 43 at 16.[11] Gonzalez explained that it was "an e-mail conversation with an old friend" who was already an "active investor" in the Company. EG 49:19-50:3; 156:157:7. On November 17, 2018, Gordon emailed about another individual, Nora Lee Notzon, who was a childhood friend of Edmundo Gonzalez and was not a potential investor. EG 103:23-104:9; OA 103:11-19.

These scattered messages over the course of three months are consistent with Axelrod's recollection that the relationship "faded away," and stand in contrast to the "full blown" process, EG 157:3, the parties undertook at the outset. In the early stages of the engagement BGSA actively advised and strategized with FreightHub; organized and ran due diligence; prepared and revised pitch materials and financial presentations; sourced and pitched investors; invited FreightHub to its annual conference for face-to-face introductions; and worked to grow the Company. SOF ¶¶ 38-40.

None of these activities were taking place by November. Indeed, two months earlier in September Gordon wrote its management: "What's happening on the deal front?" and "What's the business update? I haven't seen any numbers in several months." Dx. 33 at 1-2.

Gonzalez testifies: "Involvement is not an e-mail. Involvement is actually sourcing capital, doing stuff. That's not sending a random e-mail. And again, the process here at the

---

[11] Kerry Miller invested in FreightHub through M&M Energy Investors LLC. Dx. 24.

20

beginning was full blown and with the best of hopes, best of hopes . . . BGSA, Cambridge Capital and Ben, were no longer actively involved in the company." EG 46:13-25.

He further testified: "[T]he involvement has to be a two-way. You can't just say like, look, I sent you an e-mail, of course I'm involved. We had a formal and traditional investment banking process here to raise money. There are materials there. We met with wonderful strategic investors. The only issue is that no one invested, but outside of that it was classic. It was a classic process. Sometimes these things don't work." EG 139:10-22.

<i>No Issues of Fact</i>

BGSA raises no genuine issues of fact about this. When BGSA was asked how it was involved in the Company's November 2018 financing, BGSA's 30(b)(6) witness obfuscated. He testified circularly that it was "just the fact that we were involved in the company creates a sense of enthusiasm around the current shareholders and . . . promoted them to make an investment." Dx. 5 ("SG") 71:15-18. He testified it was "possible, but not likely" that materials BGSA prepared early in 2018 could have been utilized or shared. SG 71:11. He speculated that "the Board was aware that we are an advisor and was very excited about that." SG 70: 11-12. He could not identify any concrete tasks.[12]

By 2019, BGSA's involvement with FreightHub was nonexistent. BGSA's 30(b)(6) witness testified that its only discernible 2019 activity relating to FreightHub was that it would "mention" the company "from time to time." SG 62:18-22. It did not set up any meetings with potential investors or customers, and did not prepare or work on any written materials. SG 61:24-66:18. When asked "[c]an you recall specifically any other tasks or functions that were performed in the FreightHub engagement in 2019?" the answer was "No. We were ready, able and willing to help the company whenever we needed to as an ongoing advisor." SG 63:24-64:4.

Gordon's testimony is even more telling. When asked to describe the services that BGSA performed for FreightHub in 2019, Gordon answered: "I can think of ongoing dialogue with companies – I may get the exact months wrong, but throughout the general time frame, companies like NFI, like Convoy, like Transplace, like Prologis, like MX Express [sic]." BG 175:8-11. When asked to recall specific instances where he provided advice to Gonzalez or

---

[12] BGSA and Gordon also refused to directly answer interrogatories asking which transactions they provided advice and assistance on, merely stating that it was "on an ongoing basis," Dx. 7 at 3, ¶ 2; and it is not aware of all the transactions under the Agreement, Dx. 8 at 5, ¶ 4.

Axelrod in 2019, he responded: "I recall sharing with them interest from strategics, such as NFI. In fact, the NFI discussion is one that stood out to me[.]" BG 176:8-12.

Gordon misremembers all of these dates. All of the events he cites *occurred between August and November 2018*. The NFI meetings were arranged in July 2018 and took place in early August 2018. SOF ¶¶ 69-74. The parties emailed regarding Convoy in September 2018. *Id.* ¶ 82. The parties emailed regarding Mexpress in October 2018. *Id.* ¶ 84.  Gordon mentioned Transplace on November 8. *Id.* ¶ 86.  None of Gordon's recollections took place in 2019.

The foregoing shows there no genuine issue that by failing to remain involved, BGSA ceased to be FreightHub's ongoing advisor by November 2018 at the latest.

### C.      The Agreement Became Terminable at Will at the End of the Term

Since BGSA was no longer the Company's ongoing advisor, the Agreement expired of its own measure at the end of its one-year term. But in any event, at the conclusion of the term the Agreement became terminable at will under Florida law.

Florida law distinguishes between "perpetual" contracts, which by their explicit terms are agreed to last forever, and "indefinite" contracts, which do not provide for a fixed term. *See Joe Regueira, Inc. v. American Distilling Co.*, 642 F.2d 826, 829-30 (5th Cir. 1981)*; City of Gainesville v. Board of Control*, 81 So.2d 514, 518-19 (1955); *Cassidy & Associates of Winter Haven, Inc. v. Bright House Networks, LLC*, 2010 WL 11507560, at *3 (M.D. Fla. 2010).

Florida's governing rule is that "a contract for an indefinite period, which by its nature is not deemed to be perpetual, may be terminated at will on giving reasonable notice." *Florida-Georgia Chemical Co., Inc. v. National Laboratories, Inc.*, 153 So.2d 752, 754 (Fla. 1st DCA 1963); *Gulf Cities Gas Corp. v. Tangelo Park Service Co.*, 253 So.2d 744, 748 (Fla. 4th DCA 1971) (where contract is silent as to duration of a duty "the normal rule is that the duty is terminable at will"); *Perri v. Byrd*, 436 So.2d 359, 361 (Fla. 1st DCA 1983); *Sound City, Inc. v. Kessler*, 316 So.2d 315, 318 (Fla. 1st DCA 1975).

Here the Agreement states: "The term of this Engagement will begin on the date of this letter and continue for twelve (12) months thereafter." Dx. 9 at 2, § C. It further states that "The Company shall have the right to terminate this Agreement, but only for cause." *Id*.

No provision is made for FreightHub to terminate without cause. No provision is made for renewing the Agreement, including any notices or deadlines. No provision is made for the duration of the Agreement beyond its stated "term." The word "term" is not capitalized or

defined. And the Agreement does not state whether continuation beyond the "term" gives rise to any additional "term," whether fixed, repeating or indefinite.

BGSA's proposition that the Agreement remains in effect and goes on forever until BGSA elects to terminate it simply has no basis in law.[13]

As discussed, under Florida law a court must read the provisions of an agreement harmoniously to give effect to the entire instrument. All of its parts must be compared, used and construed with reference to each other, and an interpretation that gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation that leaves a part unreasonable, unlawful or without effect. *See supra* p. 4.

The only interpretation here concerning term and termination that is (a) consistent with Florida law (including that an indefinite contract is terminable at will); (b) internally consistent as to each of the Agreement's various provisions; and (c) gives effect to all of the Agreement's written provisions as written, is the following:

The Agreement contains a definite one year "term." During its one-year "term," FreightHub can only terminate the Agreement for "cause." If a "Transaction" occurs within the "term," BGSA remains an "ongoing advisor" and the Agreement continues beyond the term, until its "expiration or termination" including that BGSA, Cambridge or Gordon cease to remain involved. Once the Agreement becomes indefinite, it can be terminated at will upon reasonable notice, effective as of either the end of the term or thereafter.

This reading reconciles the instrument with Florida law while reading all of its provisions harmoniously and not undermining or disregarding any provision.

FreightHub's actions comported with the Agreement. In September, FreightHub gave BGSA reasonable advance notice that it would not renew the Agreement upon conclusion of its term on December 11, 2018. Axelrod wrote Gordon: "We cannot keep on the same path, getting

---

[13] This is, in fact, BGSA's position. BGSA's complaint asserts the Agreement "remains in force" and "is a valid, binding and enforceable contract, to which FreightHub must adhere to now and into the future." First Amended Complaint, ECF 51 at ¶¶ 45, 48. BGSA hedged on this position in deposition. Gordon testified that the Agreement would terminate if the Company ceased to exist and that it ceased to exist upon consummation of the Hudson merger. BG 70:22-73:3. This was incorrect as the Company underwent acquisition via share exchange and remained in existence thereafter (including as the defendant in this case). Dx. 86 at 58 § 2.1. BGSA's 30(b)(6) deponent also testified that the Agreement terminated upon merger because "we reached our goal." SG 53:1-10. This position has no support in the Agreement.

rejections, so we are doing an internal round . . . Our contract ends in December and we will not be doing another round after this internal one, so that is why I think it's best to terminate our agreement, keeping in mind the 12 months tail." Dx. 34 at 2.

On October 8, 2018 Axelrod followed up by email: "I talked to Edmundo and we will continue our agreement to the full term." Dx. 36. Gordon responded: "I know we are continuing to the full term – that's what the contract says." *Id*.

This is reasonable advance notice of termination as of the end of the term, not immediate termination. Axelrod's messages state unambiguously that "[o]ur contract ends in December" and "we will continue our agreement to the full term." Termination was thus valid and effective upon conclusion of the term.

### D.   BGSA's Alleged Damages were Avoidable, Unforeseeable, and Operate as a Penalty

BGSA argues it is entitled to ongoing damages under an ongoing agreement. It brought suit in 2021, but not of necessity; by BGSA's logic the same suit would be equally valid in 2031 or 2041 for all of FreightHub's prior capital raising.[14] That position is as wrong as it sounds on its face.

"It is hornbook contract law that the meaning of a contract is determined from the parties' intentions at the time the contract is formed." *In re Mid-America Corporation*, 159 B.R. 48, 53 (Bankr. M.D. Fla. 1993). "Damages recoverable by a party injured by a breach of contract are those which would naturally result from the breach and can reasonably be said to have been contemplated by the parties at the time the contract was made." *Sharick v. Se. University of the Health Sciences, Inc.*, 780 So.2d 136, 139 (Fla. 3d DCA 2000).

The record shows the "damages" BGSA now claims are of its own making, deliberately amassed and cultivated in silence long after the parties' relationship and dialogue ended. They are, in fact, liquidated amounts bearing no relationship to the tasks enumerated for BGSA under the Agreement; the introductions contemplated by the Agreement; or the "efforts" required by BGSA to earn success fees.[15]

---

[14] BGSA makes clear that this remains its position. See Dx. 8 at 5, ¶ 3; 6, ¶¶ 4-5.

[15] In addition to all of this, BGSA seeks to collect ongoing accruing damages without any showing that it is ready, willing or able to perform under the Agreement. It is an undisputed fact that BGSA has not performed work for years.

### 1. Recovery Is Barred as an Avoidable Consequence

Under Florida's doctrine of avoidable consequences, a claimant is barred from recovering damages it could have reasonably avoided. *System Components Corporation v. Florida Department of Transportation*, 14 So.3d 967, 982 (Fla. 2009). The doctrine applies where the claimant fails to undertake measures to avoid damages without undue effort or expense.[16] Whether the doctrine applies in a given case depends upon the facts. *Graphic Associates, Inc. v. Riviana Restaurant Corporation*, 461 So.2d 1011, 1014 (1984). The court in *Graphic Associates* gives by way of example that "an employee fired improperly cannot sit idly by and then recover his entire salary." *Id*.[17]

> The Fifth Circuit has further explained, interpreting Florida law:
>
> [W]here there has been a breach of contract . . . with only partial performance, the contractee first must attempt to mitigate his consequential damages with due diligence and to the best of his ability – and must prove that he has done so . . . [T]he measure of damages is such sum as will compensate the person injured for the loss sustained, with the least burden to the wrongdoer consistent with the idea of fair compensation, and with the duty upon the person injured to exercise reasonable care to mitigate the injury, according to the opportunities that may fairly be or appear to be within his reach, and the same rule obtains whether the loss is claimed for injury to property, personal injury, or breach of contract.

*Nello L. Teer Company v. Hollywood Golf Estates, Inc.*, 324 F.2d 669, 672 (5th Cir. 1963).

FreightHub first informed BGSA on September 27, 2018 that it would not continue the Agreement past its term. Dx. 34. On October 4, 2018, Gordon emailed a colleague and FreightHub investor his position that "[i]f they follow through . . . it would represent a breach of contract[.]" The following month, on November 8, 2018, Gordon emailed the same view to Gonzalez:

> [I]f the "counsel for the investors" is going to take the position that "Transactions" have already happened, then the company is in default of this

---

[16] This doctrine is alternatively referred to as mitigation. It is pleaded as FreightHub's fourth affirmative defense. Answer, ECF 53 at 4 ¶ 4.

[17] Avoiding unforeseeable consequences is generally considered an obligation under exclusive contracts. It applies here as the Agreement calls for BGSA to act as the Company's "exclusive advisor."

agreement, since as you know, investors I brought to the company who already wrote checks (e.g. Delmar), but I still haven't been paid [sic]. Further, if the "Transactions" have already happened, and I haven't received the shares, that would represent a second instance of a breach. Dx. 53 at 7.[18]

BGSA did not bring suit at the time. The Company then paid it in full, delivering both the success fees and retainer. BGSA had no damages to speak of at that point. Yet BGSA lay in wait while FreightHub continued growing and raising capital. On October 16, 2020, Gordon reemerged when the Hudson merger was announced, seeking fees for the merger and all capital-raising since November 2018. The doctrine of avoidable consequences bars this "sitting idly by," *Graphic Associates*, 461 So.2d at 1014, in order to win an excess recovery.

## 2.    Laches Alternatively Bars Recovery

The equitable defense of laches is a form of estoppel based on "[u]nreasonable delay in enforcing a right, coupled with disadvantage to another." *Bueno v. Mercado*, 2017 WL 4772998, at *4 (Fla. Cir. Ct., 11th Cir., August 7, 2017). "Laches bars relief claimed by plaintiff where there is conduct on the part of the defendant . . . giving rise to the situation of which complaint is made; the plaintiff, having had notice of the defendant's conduct, and having the opportunity to bring suit, is guilty of delay in asserting his rights by suit; there is a lack of knowledge on the part of the defendant that the plaintiff will assert the right on which he bases his suit; and injury or prejudice to the defendant would result in the event the suit is not held to be barred, or in the event relief is afforded to the plaintiff." *Corona Properties of Florida, Inc. v. Monroe County*, 485 So.2d 1314 (Fla. 3d DCA 1986).

Laches generally does not operate until the applicable statute of limitations has run, but an exception applies "when the equities of the situation demand that enforcement be barred. This occurs when an unreasonable delay results in prejudice to the rights of the party against whom enforcement of a debt or other obligation is sought." *Briggs v. Estate of Geelhoed*, 543 So.2d 332 (Fla. 4th DCA 1989).

To the extent the avoidable consequences doctrine does not bar BGSA's recovery, laches does. Gordon described FreightHub's actions as a "breach" and a "default" in written communications from September and November 2018, respectively. BGSA did not bring suit at

---

[18] Gordon testified that the he believed the Company was in breach even earlier, by February 2018, upon receiving its initial funds under the First Bridge. BG 67:2-68:8.

the time, and the Company fully paid the success fees and retainer.

Gordon and Gonzalez resolved the timing and mechanics for issuing the retainer by email. On December 21, 2018 Gordon wrote: "For the equity – do you want to just have it convert into 8% in the next round where there is an actual pricing? That was the original intent and certainly the simplest." Gonzalez responded "yes" and Gordon replied: "Okay. So why don't we just have a simple letter that clarifies that. Shouldn't be hard to do. Thanks." Dx. 51 at 1.

And on February 15, 2019, Gonzalez proposed issuing the 8% in two portions, "beginning with the portion representing the currently issued common stock shares and stock options, and the remainder as and when the convertible notes converted." Gonzalez concluded: "With respect to shares, that's it. There's no anti-dilution where the Transaction keeps moving forward." Gordon responded "Fine. Let's just move on." Dx. 53 at 1.

Gordon wrote "Okay" and "Fine" to these arrangements in December 2018 and February 2019, respectively. FreightHub delivered the retainer. But when the Hudson merger was publicly announced in October 2020, Gordon wrote "Can you please send me the transaction documents and cap table, so we can calculate what 8% of the total equity capitalization is, that finalize this?" Dx. 80 at 1.

This was simple predation. If BGSA believed the Company was in breach in September 2018, as Gordon wrote, it could have filed suit. Instead, it waited for a merger to be announced in October 2020 that had not even been conceived of two years earlier, filed suit in January 2021, and then demanded a second retainer plus success fees for all the Company's intervening capital raising. Application of laches is suitable on this record.

### 3. BGSA's Alleged Damages Were Unforeseeable

Speculative, remote or unforeseeable damages are not recoverable in Florida contract actions. Damages must be "a proximate result of the breach" and must be "reasonably foreseeable by the breaching party at the time of contracting." *Hardwick Properties, Inc. v. Newbern*, 711 So.2d 35, 40 (Fla. 1st DCA 1998); *see also Lanzalotti v. Cohen*, 113 So.2d 727, 731 (Fla. 3d DCA 1959).[19]

BGSA's are not. At the time of contract formation in December 2017, FreightHub's eventual path to a February 2022 public merger was completely unforeseeable and unforeseen. In particular, it was not foreseeable that:

---

[19] This is FreightHub's sixth affirmative defense. Answer, ECF 23 at ¶ 6.

- BGSA and FreightHub would fail on a Series A stock financing led by Cambridge, compelling FreightHub to raise two successive bridge rounds from existing investors with negligible help from BGSA;

- ATW and the Company would enter into a $4,000,000 loan facility in November 2018 with the Company on the brink of insolvency;

- ATW would continue nurturing the Company's growth with additional investments in 2019 and 2020, SOF ¶¶ 165-66; 188-190;

- the Company would begin exploring a possible merger with Hudson in May 2020, Dx. 82 at 130;

- FreightHub and Hudson would reach binding agreement on October 10, 2020 following five months of private negotiation and preparation, Dx. 82 at 130-134;

- the original merger agreement would be cancelled on December 13, 2021 following more than a year of SEC registration statement amendments, Dx. 83; and

- a new merger agreement would be reached on December 13, 2021, finally closing on February 14, 2022. Dx. 87 at 2.

None of this was even remotely contemplated when the Agreement was formed. Even by late 2018 when BGSA ceased to "remain involved," ATW's $4,000,000 loan facility was the only anticipated transaction. It was itself divided into up to three staggered tranches of funding, with Tranches B and C contingent on performance and other metrics. Dx. 46. FreightHub and Hudson's first ever contact would not occur for another eighteen months, when representatives first spoke on May 22, 2020. Dx. 82 at 130. BGSA had no knowledge until the public announcement. Dx. 70 at 1.

This stands to reason because in December 2017 FreightHub was a fledgling business. SOF ¶ 1. The general rule in Florida is that "the anticipated profits of a commercial business are too remote, speculative and dependent upon changing circumstances to warrant a judgment for their loss." *Aldon Industries, Inc. v. Don Myers & Associates*, 517 F.2d 188, 191 (5th Cir. 1975) (*quoting New Amsterdam Casualty Co. v. Utility Battery Manufacturing Co.*, 122 Fla. 718, 727 (Florida 1936)); *see also Alphamed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.*, 432 F.Supp.2d 1319, 1339-40 (S.D. Fla. 2006).

### 4. BGSA's Alleged Damages Operate as a Penalty

"The fundamental principle of the law of damages is that the person injured by breach of contract . . . shall have fair and just compensation commensurate with the loss sustained in consequence of the defendant's act which give rise to the action. In other words, the damages awarded should be equal to and precisely commensurate with the injury sustained." *Hanna v. Martin*, 49 So.2d 585, 587 (Florida 1950).[20]

Under Florida law, parties may stipulate in advance to an amount to be paid or retained as liquidated damages in the event of a breach. *Lefemine v. Baron*, 537 So.2d 326, 328 (Florida 1991). There are two requirements in order for a liquidated damages not to be stricken as a penalty. "First, the damages consequent upon a breach must not be readily ascertainable. Second, the sum stipulated to be forfeited must not be so grossly disproportionate to any damages that might reasonably be expected to follow from a breach as to show that the parties could have intended only to induce full performance, rather than liquidate their damages." *Id.*

The Agreement's provision on success fees provides for "10% of capital raised for capital raises, loans, or investments" or "3% of the Company's Total [sic] enterprise value for sales, mergers, or changes of control." Dx. 9 at 2, § A.2.

This provision does not purport to be a liquidated damages clause, nor is there any evidence in the record that the parties intended it as such. But under BGSA's theory of the case, that is exactly how it would operate. BGSA alleges that it has suffered roughly twenty three million dollars in damages after only helping FreightHub raise $163,000.

BGSA is unequivocal in its position that "BGSA is entitled to fees for all FreightHub transactions since the time the parties entered into this contract." Dx. 8 at 6, ¶ 4. This position transforms the success fees provision into a penalty of 10% on all future capital raising, which is "grossly disproportionate to any damages that might reasonably be expected to follow" and thus unenforceable.

### E. BGSA's Claim for Anticipatory Breach Has No Application to this Action

BGSA brings claims for both breach of contract and anticipatory breach. "An anticipatory breach of contract occurs before the time has come when there is a present duty to perform as the result of words or acts evincing an intention to refuse performance in the future." *Alvarez v. Rendon*, 953 So.2d 702, 709 (Fla. 5th DCA 2007). "Where an obligor repudiates a

---

[20] This is FreightHub's fifteenth affirmative defense. Answer, ECF 23 at ¶ 15.

duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone give rise to a claim for damages for total breach . . . [T]he nonbreaching party is relieved of its duty to tender performance and has an immediate cause of action against the breaching party." *Hospital Mortgage Group v. First Prudential Development Corp.*, 411 So.2d 181, 182 (Florida 1982) (*quoting* Restatement (Second) of Contracts § 253 (1979)).

The doctrine of anticipatory breach has no application to the facts this case. Even if all of the allegations in BGSA's Complaint were assumed to be true, it would fail to state a claim for anticipatory breach because BGSA alleges that the time for mutual performance under the Agreement came due; that BGSA tendered performance; and that FreightHub tendered performance in part by delivering some, but allegedly not all, of BGSA's compensation. BGSA's allegations of breach are backward-looking, not anticipatory, and the claim is misplaced here.

For these reasons, as well as all of the reasons discussed earlier (including FreightHub's full performance, discharge and valid termination), judgment should be entered for FreightHub on the claim for anticipatory breach.

### F.     BGSA and Gordon Have Unclean Hands

"Unclean hands is an equitable defense that is akin to fraud; its 'purpose is to discourage unlawful activity.'" *Congress Park Office Condos II, LLC v. First-Citizens Bank & Trust Company*, 105 So.3d 602, 609 (Fla. 4th DCA 2013) (*citation omitted*). Florida courts have equated unclean hands with "sneaky and deceitful" behavior. "Equity will stay its hand where a party is guilty of conduct condemned by honest and reasonable men. Unscrupulous practices, overreaching, concealment, trickery or other unconscientious conduct are sufficient to bar relief." *Id.* (*quoting* Fla. Jur.2d, Equity, § 50). Unclean hands justifies dismissal of a claim where "inequitable conduct impregnate[s the] entire cause of action." *Id.* (*quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 819 (1945)).[21]

To establish a defense of unclean hands, a defendant must show it (a) relied on the misconduct; and (b) was harmed by the misconduct. *McMichael v. Deutsche Bank National Trustee Company*, 241 So.3d 179, 181 (Fla. 4th DCA 2018) (*internal citations and quotes omitted*). It must further demonstrate that the wrongdoing is directly related to the claim(s). *Regions Bank v. Old Jupiter, LLC*, 2010 WL 5148467, at *5 (S.D. Fla. 2010).

---

[21] Unclean hands is FreightHub's third affirmative defense. Answer, ECF 23 at ¶ 3.

Unclean hands is generally available only where a plaintiff seeks equitable relief, either by itself or addition to monetary damages. *Id*. at *6.

### 1.    Unclean Hands is Available as a Defense

As a threshold matter, unclean hands is an available defense here because BGSA seeks equitable relief under its declaratory judgment claim. The Eleventh Circuit has explained:

> Suits for declaratory judgment are a statutory creation enacted by Congress in the Declaratory Judgment Act, 28 U.S.C.A. secs. 2201-02, and are neither inherently legal nor equitable in nature. When determining whether a declaratory judgment action is legal or equitable, "courts have examined the basic nature of the issues involved to determine how they would have arisen had Congress not enacted the Declaratory Judgment Act."

*Gulf Life Insurance Company v. Arnold*, 800 F.2d 1520, 1523 (11th Cir. 1987) (*internal citation omitted*). *See also Yacht Club on the Intracoastal Condo Association v. Lexington Insurance Co.*, 599 F.App'x 875, 883 (11th Cir. 2015) ("a court should look behind the procedural vehicle used in a complaint to discern what true relief is sought"); *Eccles v. Peoples Bank of Lakewood Village, California*, 333 U.S. 426, 431 (1948) (*Reed., J., dissenting*) ("[t]here is no difference between declaratory suits involving an equitable remedy and other equity suits").

BGSA's claim for declaratory judgment seeks specific enforcement of the Agreement, an equitable remedy. *See Garcia v. Rambo Security Patrol, Inc.*, 2010 WL 750296, at *1 (S.D. Fla. 2010); *Connell v. Mittendorf*, 147 So.2d 169, 172 (Fla. 2nd DCA 1962). BGSA "contends that the Agreement is a valid, binding, and enforceable contract, to which FreightHub must adhere to now and into the future." Complaint, ECF 51 at ¶ 45. BGSA pleads that there is a need for declaratory relief "with respect to whether the Agreement remains in force" and "whether BGSA continues to be entitled to performance under the Agreement." *Id*. at ¶ 48. BGSA asks the Court declare that the Agreement "is valid, binding and enforceable" and "has not been properly terminated." *Id*. at p. 10. These are equitable remedies to enforce the Agreement.

### 2.    Unclean Hands is Shown

BGSA and Gordon's course of dealing was shot through with "[u]nscrupulous practices, overreaching, concealment, trickery [and] unconscientious conduct." *Congress Park Office Condos*, 105 So.3d at 609.

*BGSA and Gordon Hid the SEC Investigation*

Gordon was suspended by the SEC for a year beginning in June 2019 for his role in Ability's financial misstatements. His suspension was the upshot of more than two years of SEC investigation, which BGSA and Gordon hid from FreightHub throughout.



Dxs. 11, 12, 13. FreightHub was never informed. The record sheds light on why BGSA's introductions then contributed only $163,600, a paltry amount given the $5,000,000 fundraising goal.

Dx. 32 at 5.

BG 136:20-138:10; OA 131:10-131:1. On January 31, 2018, days after BGSA's 2018 supply chain conference, Gordon emailed a colleague that "I spent nearly all of the time before and after the conference dealing with [investigation]-related issues, and not actually getting to work on my business, these deals [including FreightHub], or the things I should be spending time on right now." Dx. 22 at 1.

Dx. 25 at 22:16-18. FreightHub was completely unaware.

Dx. 61 at 9, ¶¶ 41-42.

*Gordon Violated the Exchange Act and Suspension Order in his Dealings with FreightHub*

███████████████████████████████████████████

Dx. 61 at 3, ¶ 6.

The Exchange Act defines a "person associated with a broker or dealer" or "associated person of a broker or dealer" as "any partner, officer or branch manager of such broker or dealer (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with such broker or dealer, or any employee of such broker or dealer." Exchange Act § 3(a)(18).

Gordon was suspended pursuant to Exchange Act § 15(b). Exchange Act § 15(b)(6)(B) provides that it "shall be unlawful" for a person as to whom such a suspension order is in effect "willfully to become, or to be, associated with a broker or dealer in contravention of such order," or "for any broker or dealer to permit such a person, without the consent of the Commission, to become or remain, a person associated with the broker or dealer, if such broker or dealer knew, or in the exercise of reasonable care should have known, of such order."

Gordon violated the Order and Exchange Act § 15(b)(6)(B) by negotiating with FreightHub as a principal of BGSA during the term of his suspension. There is no genuine issue of fact about this: Gordon negotiated and offered agreement on BGSA compensation, under a BGSA agreement, on behalf of BGSA, in writing.

On October 21, 2019, roughly four months into the suspension period, Gordon wrote Gonzalez about payment of the retainer: "With respect to Fr8Hub, after discussing this with counsel, our position would be to just go with what is in the engagement letter." He wrote "I hope we can resolve this amicably," and "[i]f we are in agreement, we can close this and move on." Dx. 70 at 3. When Gonzalez suggested "hav[ing] your counsel meet ours and try to solve this asap," Gordon responded on October 22 that "we can get the lawyers together, but I'm not really sure it solves anything . . . For starters, subordinate equity sitting under all the money isn't worth anything, and it also isn't stipulated as such in the agreement . . . Why not just agree on that and move on[.]" Dx. 70 at 2-3. Gordon's multiple attempts to "agree" on the retainer were "directly or indirectly controlling" BGSA in contravention of the Exchange Act.

*Gordon Misrepresented the Suspension Order*

33

In continuation of their dialogue above, Gonzalez wrote Gordon in relevant part on October 25: "Other shareholders have brought concerns to my attention related to, among others, a Wells Notice and subsequent fine by the SEC on another matter. I don't know what this is about, and I'm sorry you're dealing with this. We therefore would not be able to engage you as a consultant." Dx. 70 at 1.

Gordon responded: "Thanks so much for raising that issue. Yes. I made the mistake of investing in a company whose CEO proved to be a bad guy. And yes, I lost money and am in litigation with them. And yes, I agreed to settle ***on a no-admit basis*** with the SEC in order to focus my efforts and resources on litigation with the company. No, that does not prevent you, or anyone, from 'engaging me as a consultant.' And yes, that also makes me that much more determined to stand up for my rights, and not get screwed again." Dx. 70 at 1 (*emphasis in original*).

Here Gordon both concealed and misrepresented the truth about his suspension. After Gonzalez made clear that "I don't know what this is about," Gordon deliberately did not disclose that he had been suspended for one year for willful securities violations; that he was under suspension and barred from associating with BGSA at the time of his writing; that he had been fined $100,000 under the Order; or that he was found to have acted negligently in the disclosure of information to shareholders. He did not furnish a copy of the Order to FreightHub or offer to do so.

*Gordon Violated his Offer of Settlement*



███████████████████████████████████████████████

Gordon not only wrote, but emphasized, to Gonzalez that he "agreed to settle *on a no-admit basis*," and did so "in order to focus my efforts and resources on litigation." Dx. 70 at 1 (*emphasis in original*). In so doing, Gordon violated his Offer of Settlement and 17 C.F.R. § 202.5(e) by stating that he did not admit the findings in the Order without also stating that he did not deny the findings. █████████████████████████████████████

*BGSA Has Unclean Hands in its Retainer Demands*

BGSA's demands for the retainer are "sneaky," "deceitful," "unscrupulous" and "overreaching." As shown at length, BGSA demands an 8% equity retainer payment it already received. Gordon wrote that receiving the retainer upon conversion of the Company's November 2018 debt would be "[o]kay." Dx. 51 at 1. When Gonzalez reiterated that timing, and that the retainer was not dilution-protected, Gordon wrote: "Fine. Let's just move on." Dx. 53 at 1. FreightHub then delivered the retainer in January 2020 in excess of what was owed. Dxs. 71; 72; 73. Yet in October 2020, Gordon returned and asked for "the [Hudson] transaction documents and cap table, so we can calculate what 8% of the total equity capitalization is, an finalize this[.]" This is shameless and unscrupulous double-dipping.

## VII.   FREIGHTHUB SHOULD BE GRANTED SUMMARY JUDGMENT ON ITS COUNTERCLAIMS FOR REFORMATION AND DECLARATORY JUDGMENT

### A.   FreightHub's Counterclaim for Reformation Should be Granted

Even if the Court declines to find that FreightHub has fully performed under the Agreement and its remaining duties have been discharged; or that the Agreement expired or was validly terminated; or that BGSA has failed to show any cognizable damages, the Court should, in the alternative, reform the Agreement under FreightHub's third counterclaim to express that the Company is limited to terminating for "Cause" only during its term, and that the Agreement is terminable at will thereafter.

The equitable remedy of contract reformation is available where there is "unilateral mistake on one side of the transaction, and inequitable conduct on the other." *Ayers v. Thompson*, 536 So.2d 1151, 1154 (Fla. 1st DCA 1988); *see also Camichos v. Diana Stores Corporation*, 157 Fla. 349, 358-59 (Florida 1946). "The underlying rationale is that in reforming

a written instrument, an equity court in no way alters the agreement of the parties. Instead, the reformation only corrects the defective written instruments so that it accurately reflects the true terms of the agreement actually reached." *Id.* The evidence of unilateral mistake "must be clear and convincing." *Id.*

This case presents a unilateral mistake on one side and inequitable conduct on the other. BGSA's inequitable conduct is obvious: it is using the absence of an express without cause termination provision to extract millions in unearned fees, and is further seeking its 8% retainer *twice*. All of this came as a complete surprise to the Company – there is no evidence in the record that BGSA ever placed the Company on notice of its current theories of recovery, prior to filing suit in 2021.

A unilateral mistake is also established by the record. Gonzalez testified unequivocally that a "forever contract" was "never the intention" and would be "highly, highly abnormal and absolutely weird." Gonzalez testified:

- "I've been the party to dozens of these [agreements]. In no way is it appointing you as a forward advisor forever." Dx. 4-1 ("EG") 135:15-17.

- "[L]ook, most certainly a kind of forever contract, I've never seen this in my life. Complete inability to terminate anything forever and ever is definitely not our understanding of this agreement." EG 58:19-23.

- "I had never seen a forever and ever and ever, you know, contract with no possibility of termination." EG 131:14-17.

- "[T]he process [with BGSA] didn't work, so having a strategic advisor that let's say [ATW] brings in a co-investor, and having an advisor that would take a large commission now with literally, without any work, right? That is not how investment banking is done. That would be highly, highly abnormal and absolutely weird . . . [Y]ou can't have a call on all capital forever. That was never the intention here, right? The intention was to do a deal, and if the deal is successful, okay, so you go on." EG 205:15-206:4.

The Agreement should be reformed to make clear that the Agreement is terminable at will following the conclusion of its one-year term. This is consistent with the remainder of the Agreement, does not conflict with any provision of the Agreement, and does not render any other provisions superfluous or confusing. The requisite reformation is extremely limited and does not

undermine or alter the bargain.

      **B.**      **Declaratory Judgment Should be Granted for FreightHub**

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides in relevant part that the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." There must be allegations of a "substantial continuing controversy between parties having adverse legal interests." *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985). A party "must allege facts from which the continuation of the dispute may be reasonably inferred." *Id*. at 1552.

BGSA and FreightHub seek dueling declaratory judgments that the contract is, or is not, in effect. For all the reasons given throughout, FreightHub's declaratory judgment claim should be granted and BGSA's denied. There is no genuine issue of material fact that the Agreement is fully performed and its duties discharged. In arguing the Agreement remains effective, BGSA seeks an absurd result belying common sense. It is 2023. The parties have not worked together since 2018. To the extent FreightHub is deemed to have terminated the engagement, that termination is valid and enforceable because the Agreement was terminable at will. To quiet any further debate, the Court is respectfully asked to adjudge and declare that the Agreement ended upon the conclusion of its term on December 11, 2018; that BGSA is fully paid; and that any and all further duties and obligations of the Company under the Agreement are discharged.

## CONCLUSION

For all of the foregoing reasons, FreightHub respectfully asks the Court to enter judgment in its favor on all of BGSA's claims, as well as on FreightHub's third and sixth counterclaims seeking reformation and declaratory judgment, respectively, together with such other and further relief as the Court deems just and proper.

May 26, 2023

Respectfully submitted,

SEQUOR LAW
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
fmenendez@sequorlaw.com
Telephone: (305) 372-8282
Facsimile: (305) 372-8202

By:     */s/ Fernando J. Menendez*
           Fernando J. Menendez
           Florida Bar No.: 18167

and

RPCK RASTEGAR PANCHAL LLP
By: Jeremy Saks
60 E. 42nd Street, Suite 2410
New York, NY 10165
jeremy.saks@rpck.com
Telephone: (212) 594-9600

*Attorneys for FreightHub, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case on May 26, 2023.

           */s/ Fernando J. Menendez*
           Fernando J. Menendez